**Frank WOHL, Temporary Receiver for Volume Investors Corp., Plaintiff,**

v.

**Gerald WESTHEIMER (a/k/a Jeffrey Westheimer), Valerie Westheimer and James Paruch, Defendants.**

**No. 85 Civ. 2230 (KTD).**

United States District Court,
S.D. New York.

April 4, 1985.

Barrett Smith Schapiro Simon & Armstrong, New York City, for plaintiff; William O. Purcell, Edmund R. Schroeder, Eileen J. Berkman, Jack G. Lerner, New York City, of counsel.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, New York City, for defendants Gerald and Valerie Westheimer; Jeffrey A. Fillman, Stuart K. Lesansky, David Burger, New York City, of counsel.

Lovell & Stewart, New York City, for defendant James Paruch; Christopher Lovell, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Trading in gold options is a highly volatile market where fortunes can be made and lost in one day. This case should stand as a reminder that the fallout from an explosive day in the gold market can affect not only the traders in that market but can also have a detrimental effect on the market place, including the organized exchanges dealing in gold, the exchange clearing house, the members of the exchange, and the innocent public customers of member firms, which customers may not even be involved in the trading of gold or gold options. Such explosive trading happened between the opening of trading on the Commodities Exchange ("COMEX") on Monday, March 18, 1985 and the close of trading on Tuesday, March 19, 1985, when the price of gold surged by approximately $44 per ounce.

Valerie and Gerald Westheimer as members of the COMEX have been, for the last year, involved in the trading of gold options. On March 18th, the accounts of the Westheimers and another exchange member, James Paruch, whose accounts were guaranteed by the Westheimers, were each near the maximum of 4,000 short gold call options for a total of approximately 12,000 short gold call options. While members of the exchange may trade freely with each other, they are required to clear their accounts by either being a member of the COMEX clearing house or by funneling their trades through a member of the clearing house. The COMEX clearing house matches the trades from the floor every evening after the close of trading and by the following morning renders an account to each clearing member crediting the member with the gains or losses from the previous day's trading. Where margin trading is permitted, the clearing house bills the member for margin every morning and is entitled to payment by 11:00 a.m., just a few short hours after the account is rendered. Thus, each clearing member prepares an account for each of its customers (including non-clearing members of the COMEX) on an overnight basis and attempts to have margin calls paid before its 11:00 a.m. deadline for required payment to the clearing house.

On Wednesday, March 20, 1985, Volume Investors Corp. ("VIC"), the brokerage firm through which the Westheimers and Mr. Paruch cleared their trades, missed a multi-million dollar margin call because of trades made by the defendants. VIC and all of the defendants were immediately suspended from trading on the COMEX and notification of this action and the reasons therefor was given to the Commodity Futures Trading Commission ("CFTC") and the various other exchanges.

On March 21, 1985, the CFTC commenced an action against VIC (85 Civ. 2213

(KTD)) alleging violations of the Commodity Exchange Act and the regulations promulgated thereunder arising from the missed margin call. In the early morning hours of March 21st, the CFTC presented to the Part I judge, at her home, a proposed order providing for injunctive relief against VIC and the appointment of a temporary receiver. The order was signed and the plaintiff was appointed. This action was subsequently assigned to me.

Almost simultaneously with his appointment, the temporary receiver commenced an action against the Westheimers and James Paruch, (85 Civ. 2230 (RLC)), alleging basically that they breached a customer agreement that they signed upon opening accounts at VIC which obligated them to maintain sufficient margin in their accounts at VIC. This second action, though initially assigned to Judge Carter, was reassigned to me as a related case. At the same time that the temporary receiver commenced the action against the Westheimers and Mr. Paruch, an application was made, by Order to Show Cause, for an order of attachment against the assets of the three defendants and specifically with respect to $3.4 million which had been transferred, at the direction of Valerie Westheimer, to Lazard Freres & Co. ("Lazard Freres"), which brokerage firm was to convert the monies into bearer securities. The request for an attachment with respect to Mr. Paruch's assets became moot when the parties stipulated to an arrangement concerning his assets.[1] A hearing on the request for attachment was thereafter scheduled for Wednesday, March 27, 1985.

On March 27th, certain preliminary matters were disposed of and shortly thereafter, a third action was commenced by the Westheimers against a myriad of individuals including the President of VIC, COMEX, and the temporary receiver. (85 Civ. 2388 (KTD)). The Westheimers allege that the defendants manipulated the price of futures and options and in other, yet unde-

fined ways, caused the losses suffered by the Westheimers. Upon the commencement of this action, the Westheimers moved by Order to Show Cause seeking a variety of relief including the appointment of a special master to supervise discovery, expedited discovery, the removal of the receiver, an injunction against COMEX's prosecution of administrative proceedings, and the impounding of certain documents. At the hearing held on March 28, 1985, most of this requested relief was denied, and to the extent I did not address any of the requests included in the Westheimer's Order to Show Cause, with one exception, they are formally denied.

The exception involves the appointment of a receiver in this matter. The temporary receiver, Frank Wohl, is assertedly a recent former member of the law firm of Rosenman, Colin, Freund, Lewis & Cohen, counsel for VIC. As such, he is alleged to have a conflict of interest; but on the record developed thus far, it is impossible to determine. Accordingly, Mr. Wohl is directed to submit an affidavit which sets forth any factors that may be relevant in ascertaining the nature and extent of any potential conflict.

## ATTACHMENT

■ Frank Wohl, as temporary receiver for VIC, pursuant to Fed.R.Civ.P. 64 and N.Y.Civ.Prac.Law and Rules ("CPLR") §§ 6201, 6210, and 6212, seeks an order of attachment directing the levy upon "such property in which the defendants have an interest and upon such debts owing to the defendants as will satisfy the amount of not less than $14 million."

CPLR § 6212(a) provides that:

On a motion for an order of attachment, . . . the plaintiff shall show, by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided

---

1. After the parties entered into a stipulation concerning Mr. Paruch, a motion was filed by Mr. Paruch on March 27, 1985 seeking damages, sanctions, and attorneys' fees on the ground that the attachment against Mr. Paruch was frivolously sought. That motion is denied.

in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff.

CPLR § 6212(a) (McKinney 1980). The section 6201 ground relied on by the temporary receiver provides that:

An order of attachment may be granted ... when:

3. the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts.

CPLR § 6201 (McKinney 1980).

The provisional remedy of attachment is a harsh remedy, *see First National Bank v. Highland Hardwoods, Inc.*, 98 A.D.2d 924, 471 N.Y.S.2d 360, 362 (3d Dep't 1983), and when the plaintiff is asserting that the attachment is necessary to prevent the perpetration of a fraud on creditors, the plaintiff must show that the defendant acted or is acting with an intent to defraud which intent will not be lightly inferred, *see Brastex Corp. v. Allen International, Inc.*, 702 F.2d 326, 331 (2d Cir.1983).

▉ There is no question that the first two elements in section 6212(a) are satisfied. It is clear that the Westheimers were obligated to supply VIC, on demand, additional margin before 11:00 a.m. the day after the trading occurred. It is undisputed that each of the Westheimers, upon opening their respective accounts with VIC, signed a "Commodity Customer Agreement" and an "Options Disclosure Statement." The latter statement provided, in large print, that:

BECAUSE OF THE VOLATILE NATURE OF THE COMMODITIES MARKETS, THE PURCHASE AND GRANTING OF COMMODITY OPTIONS INVOLVE A HIGH DEGREE OF RISK.... SUCH TRANSACTIONS SHOULD BE ENTERED INTO ONLY BY PERSONS WHO HAVE READ AND UNDERSTOOD THIS DISCLOSURE STATEMENT.... A PERSON SHOULD NOT PURCHASE A COMMODITY OPTION UNLESS HE IS ABLE TO SUSTAIN A TOTAL LOSS OF THE PREMIUM AND TRANSACTION COSTS OF PURCHASING THE OPTION. A PERSON SHOULD NOT GRANT A COMMODITY OPTION UNLESS HE IS ABLE TO MEET ADDITIONAL CALLS FOR MARGIN WHEN THE MARKET MOVES AGAINST HIS POSITION, AND, IN SUCH CIRCUMSTANCES, TO SUSTAIN A VERY LARGE FINANCIAL LOSS.

*See* Plaintiff's Exh. 1.

The margin provisions in the Commodity Customer Agreement are equally unambiguous. The Westheimers testified at the hearing that they did not read any of the documents that they signed at the time that they opened their accounts at VIC. I find such a statement to be incredible. Even if it were true, however, it is no excuse; they are legally chargeable with knowledge of what they sign. Furthermore, given the educational, personal, and professional backgrounds of both defendants, I find completely unbelievable their testimony that they were only "vaguely aware of" margin requirements imposed on them and/or VIC.

Thus, it is apparent that plaintiff both has a cause of action against the Westheimers and is likely to succeed on the merits. The issues left to be resolved are: (1) whether the receiver had a cause of action against the defendants which exceeded all counterclaims, and (2) whether these defendants were about to secrete their assets or remove them from the jurisdiction of the court so as to defraud their creditors.

In his case, the receiver proved his *prima facie* claim for approximately $14 million against the defendants and there was no showing of any viable counterclaim. Thus, plaintiff prevailed on the first issue. On the second item, however, the direct case showed merely that when their fragile house of cards in the gold options market collapsed, one of the defendants made the comment that it would be better to leave

the country with their remaining assets. If the case had ended at that point, I would have found against the receiver on this second crucial issue and denied the attachment. I could well see such a comment being made as a sort of gallows humor. But the defendants chose to put in a case. And based in great part on the motives disclosed by the tissue of lies they tried to spin in their testimony, the admissions they made, and the rebuttal case introduced, I am compelled to issue the requested attachment orders to prevent the fraud on creditors obviously contemplated by the Westheimer defendants.

There was testimony adduced at the hearing that, on a daily basis in the morning, certain documents, including individual account statements and margin requests, if any, were prepared by Saul Dworkin, Executive Vice President and Operations Manager of VIC, or his assistant, Kim Tully, and thereafter taken by a "runner," Thomas O'Brien, to the customer or his designated representative. See Transcript ("Tr.") 115–16. The account statements for the Westheimers' accounts and the Paruch account, which had been guaranteed by the Westheimers, were delivered on a daily basis to one of the clerks employed by the Westheimers on the floor of the Exchange. A phone call was also made prior to 9:00 each morning by Dworkin or his assistant to Valerie Westheimer at her home informing her of the status of the three accounts and the need for margin, if any.

Kim Tully testified that on the morning of March 19th, Saul Dworkin was not at VIC, and therefore she prepared the margin requests for the Westheimers' accounts and the Paruch account, see Plaintiff's Exh. 3, and spoke to Valerie Westheimer on the phone. See Tr. 400. Mrs. Tully testified that she told Mrs. Westheimer the amount of Treasury Bills and the total equity in the accounts and the initial margin. See id. at 401. Mrs. Tully further stated that she did not recall whether she used the words "margin call" or "margin request" but did testify that she specifically told Mrs. Westheimer that approximately $1.8 million had to be deposited immediately for Gerald

Westheimer's account, approximately $1.4 million for James Paruch's account, and approximately $700,000 for Valerie Westheimer's account. See id. at 402. Mrs. Tully then asked Mrs. Westheimer when she could expect the $4 million transfer and Mrs. Westheimer apparently indicated that she would get back to Mrs. Tully. Later, Mrs. Tully stated, Valerie Westheimer telephoned VIC and informed her that $1.5 million was being transferred to VIC. Mrs. Tully told Mrs. Westheimer that $1.5 million was insufficient and then Mrs. Tully contacted Owen Morrissey, the President of VIC and Mr. Dworkin. See id. at 403.

Harry Rosenberg of Lazard Freres also testified at the hearing. See id. at 394–400. The following facts are adduced from his testimony as well as the Affidavit of Fred Michael Santo, Esq.: On Wednesday, March 20, 1985, at 4:01 p.m., Valerie Westheimer transferred to Lazard Freres $3.4 million and directed that the funds be used to purchase bearer securities to be paid out to a person named "Rose McFarland." Mr. Rosenberg testified that Mrs. Westheimer wired the funds to Lazard Freres after being told that it would take approximately one week to complete the settlement of the transaction. Mr. Rosenberg testified that before wiring the funds, Mrs. Westheimer indicated that she needed to purchase the securities as quickly as possible and mentioned by way of rationale for the transaction, a pending divorce.

I find from the combined testimony of Owen Morrissey, Saul Dworkin, Kim Tully, and Harry Rosenberg that the Westheimers were properly informed of the status of their accounts including that a margin call was being made on March 19th and that they had the funds necessary to meet the call but instead attempted to secrete from their creditors at least $3.4 million of assets. Mrs. Tully and Mr. Rosenberg testified after the defendants put in their case. Had the plaintiff rested after his initial case was presented, consisting only of Mr. Dworkin and Mr. Morrissey, I would have been constrained to deny the attachment order as the only evidence of an intent to

defraud seemed to be a passing statement by the Westheimers, subject to different interpretations, that they would be better off if they left the country. However, once the Westheimers testified, combined with the testimony of Mr. Rosenberg and Ms. Tully, I determined that an order of attachment is not only justified, it is necessary to prevent financial injury to innocent parties.

The Westheimers were not merely evasive in their testimony, they lied! Both Westheimers testified repeatedly that nothing was ever said to them regarding a margin call or request. Both testified that they did not know that margin was due from them upon the 19th, 20th, or 21st.

Gerald Westheimer, a graduate of MIT with a degree in Nuclear Engineering, became interested in the commodities field through his father who was one of the founders of the COMEX in 1933. *See* Tr. at 196. In 1967, Westheimer left the engineering field and joined a brokerage firm as a clerk. He became a broker and junior partner and left that firm after three years to join Floor Brokers Associates. *See id.* He became a senior partner and at some point was the managing partner. In 1982, after 12 or 13 years, Gerald Westheimer left Floor Brokers Associates to form with the brother of the defendant Paruch a small brokerage operation involved in executing copper trades on the COMEX. *See id.* at 197. Valerie Westheimer, who holds a graduate degree in Mathematics from the Courant Institute of Mathematical Sciences at NYU, owned a membership on the COMEX as far back as 1975. *See id.* at 302. Valerie Westheimer relinquished her seat on the COMEX when it moved to the World Trade Center, but in July of 1984, she had her membership reinstituted.[2] *See id.* at 355.

The Westheimers became customers of VIC in July and August of 1984. These accounts, along with the Paruch account, guaranteed by the defendants, were used to trade gold future options. Gerald and Valerie Westheimer were so involved in dealing commodities that they had two monitors installed in their Park Avenue residence whereby they could get the quotations from the various security and commodity exchanges. Furthermore, they would receive phone calls both in the evening and then again in the morning from the overseas markets in London and elsewhere reporting on the price of gold and other commodities. The trading engaged in by the Westheimers was quite heavy at times. Each of the three accounts involved here was almost to the maximum allowed in gold. Gerald Westheimer testified that he often made his trades directly on the floor and that he and his wife employed at least three clerks to assist in that trading. Valerie Westheimer testified that she kept a record of all such trades at home and that the morning phone calls from Dworkin or his assistant at VIC were used by her to check the accuracy of VIC's record of their accounts.

With the background of the Westheimers and the sophisticated nature of their business in mind, I find incredible their asserted ignorance of margin calls generally and VIC's margin call to them specifically. For example, Gerald Westheimer testified, "I knew my position was not good. As far as margin, I had no idea—not no idea, but not a real good idea." Tr. 204. In addition, Mr. Westheimer testified that although he could calculate the required margin and his loss, he made no attempt to do so. The Westheimers testified that they did not know the reason VIC required the $4 million on March 19, 1985. After darkness had fallen on the night of March 20, 1985 the Westheimer defendants were in constant contact with VIC. They left their Park Avenue apartment to journey to the offices of VIC, located at 160 Broadway, to discuss the "problem." While they stated that even before they left their apartment, they requested that the Officials of COMEX and the clearing house be notified,

2. Owen Morrissey, President of VIC, was one of Valerie Westheimer's sponsors for reinstituting her membership in the COMEX.

they also testified that they did not know the extent of the "problem" even after meeting with VIC at its lower Broadway office. Saul Dworkin testified that he also went to VIC's office that night to figure out the margin to be required for the Westheimer accounts. The Westheimers testified that they sat in the office with Dworkin for over an hour that night and that the only thing discussed was the weather. When they were asked for money on that evening, they testified that it was their understanding that it was needed to guarantee a buy-out price or for a consortium and that they really did not understand it but believed that a margin call was not being made because a resolution to "the problem" was being worked out. Again, given the mathematical backgrounds of both defendants, the calculations which they mentally performed almost instantaneously on the witness stand, and their history in the gold options market, I find this explanation completely untenable.

The only conclusion that I can draw from the blatant prevarications of the Westheimers and all of the evidence produced is that in fact they are of a mind to defraud their creditors and possibly abscond with their remaining assets to frustrate the enforcement of a judgment that might be rendered in plaintiff's favor.[3] Valerie Westheimer testified that after a restraining order had been issued freezing all of her assets, she withdrew $1 million from an account at a bank that had yet to be notified of the restraining order. *See* Tr. 392. Mrs. Westheimer testified that this was done at the behest of her attorneys who presently have those monies.

Accordingly, a warrant of attachment will issue to the United States Marshal for all assets of the defendants Westheimer including the $1 million transferred to the law firm of Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey.

It is further ordered that the undertaking be and the same hereby is fixed in the sum of $75,000, which amount the sum of $70,000 thereof is conditioned that the plaintiff will pay to the defendant all costs and damages including reasonable attorneys' fees which may be sustained by reason of the attachment if the defendant recovers judgment or if it is finally decided that the plaintiff was not entitled to an attachment of the defendants' property, and the balance thereof conditioned that the plaintiff will pay to the United States Marshal all of his allowable fees, and the plaintiff shall file such undertaking within ten (10) days of the entry of this Opinion.

SO ORDERED.

---

**3.** The motion, filed by the Westheimers, to dismiss the complaint for lack of subject matter jurisdiction was denied in the March 28, 1985 hearing. Their motion for sanctions pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 is obviously denied as moot.