COMEX CLEARING ASSOCIATION, INC. as successor to John F.X. Peloso, Receiver for Volume Investors Corporation, Plaintiff,

v.

FLO–ARB PARTNERS, Ronny Apfel and A.R. Goldstein (a/k/a Ramy Goldstein), Defendants.

FLO–ARB PARTNERS, Ronny Apfel, and Abraham Goldstein, Plaintiffs,

v.

VOLUME INVESTORS CORPORATION, Defendant.

Nos. 85 Civ. 3662 (KTD), 85 Civ. 3562 (KTD).

United States District Court, S.D. New York.

Jan. 27, 1989.

Baer Marks & Upham, New York City (Barry J. Mandel and Allan Dinkoff, of counsel), for Comex Clearing Ass'n, Inc., substitute for John F.X. Peloso, Receiver for Volume Investors Corp.

LeBoeuf, Lamb, Leiby & MacRae, New York City (Gary Apfel and Nancy I. Ruskin, of counsel), for Flo–Arb Partners, Ronny Apfel and Abraham Goldstein.

Barrett Smith Schapiro Simon & Armstrong, New York City (William O. Purcell and Jack G. Lerner, of counsel), for receiver.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

### I. *Background*

This opinion will, I hope, conclude the story of the financial collapse of Volume Investors Corporation ("Volume"). At all pertinent times, Volume was a member of the Commodities Exchange, Inc. ("COMEX"), and the Comex Clearing Association ("CCA"). Volume was also a futures commission merchant ("FCM") registered with the Commodities Futures Trading Commission ("CFTC") pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1–26 (1982 & Supp. IV 1986). In its position as an FCM and as a member of COMEX and CCA, Volume handled accounts for members of the public and for other FCMs.[1]

---

1. For definitions of technical terms in the future markets see *Leist v. Simplot,* 638 F.2d 283, 286–88 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and *Ryder Energy Distribution v. Merrill, Lynch Commodities, Inc.,* 748 F.2d 774 (2d Cir.1984).

For a more detailed exposition of the facts underlying the collapse of Volume Investors,

Flo–Arb Partners ("Flo–Arb") was also an FCM duly registered and, through one of its partners, a member of COMEX. To clear its trades through CCA, Flo–Arb put all of its accounts with Volume and was permitted to act as a floor broker on the Commodities Exchange by reason of a guarantee issued by Volume. Flo–Arb is made up of two general partners: Ronny Apfel and Abraham Goldstein. A detailed description of the individual partners' background will be given later in this opinion; it is sufficient now to say that both Apfel and Goldstein were quite knowledgeable about the futures market and the fact that it constituted a high-risk business and both had been active in the futures markets prior to the formation of Flo–Arb Partners.

On March 21, 1985, prior to the commencement of trading on COMEX, Frank H. Wohl was appointed Temporary Receiver of Volume. The appointment was made pursuant to an order of a judge of this court, on application of CFTC and on consent of Volume. At the same time Volume was suspended as a member of COMEX and of CCA. The Temporary Receiver undertook to liquidate the positions of Volume in an orderly manner and pursuant to the rules of CCA as approved by CFTC. Wohl effectively secured the records and property of Volume and worked out arrangements for the initial liquidation of the Volume account at CCA.

Shortly thereafter, I appointed John F.X. Peloso as the Receiver of the Estate of Volume. Peloso undertook the wind-up of the estate, including sales of property, re-negotiation of leases, and payments to public customers of Volume. The claims of Flo–Arb against Volume and its successors, and the claims of Volume and the receivers against Flo–Arb are now the main barrier to completion of the wind-up. These claims were held aside to be resolved

after all of the public was out of the picture and all of the din appurtenant thereto had quieted.

During the pendency of these actions, CCA paid out the purely public customer accounts, *i.e.,* the non-members of COMEX, and became the successor to the receiver of Volume.[2]

## II. *Trading in Commodities and Futures Markets*

Once before, in a dispute related to this matter, I set forth my views on the risks involved in trading on certain commodities and futures markets. I nonetheless believe it necessary to reiterate what I have said because much of it has apparently fallen on deaf ears.

> Trading in gold options is a highly volatile market where fortunes can be made and lost in one day. This case should stand as a reminder that the fall-out from an explosive day in the gold market can affect not only the traders in that market but can also have a detrimental effect on the market place, including the organized exchanges dealing in gold, the exchange clearing house, the members of the exchange, and the innocent public customers of member firms, which customers may not even be involved in the trading of gold or gold options.

*Wohl v. Westheimer,* 610 F.Supp. 52, 53 (S.D.N.Y.1985).

It has also been said that the futures markets are places where only professionals (and perhaps angels) should dare to tread. Speculation in the futures markets can be undertaken only by those who stand ready to lose their entire investment and then some. Even "hedging" is a high-risk business to be undertaken only by those with a substantial position in the underly-

---

Inc. see my Opinion in *Wohl v. Westheimer,* 610 F.Supp. 52 (S.D.N.Y.1985).

**2.** The matters presently before the court involve only the claims between Flo–Arb Partners, Ronny Apfel and Abraham Goldstein, on the one hand and Volume Investors, Inc. and its successors in interest on the other hand.

I see no need to deal *in extenso* with the argument advanced by counsel to the receiver as to whether the action could be brought by Flo–Arb against the receiver without prior leave of court. The argument is valid but technical and since the action must be dismissed on the merits, I see nothing to be gained by reliance thereon.

ing commodity or a substantial position in another market.

### III. *Background of Flo–Arb and its Partners*

The partners of Flo–Arb, Apfel and Goldstein, were not "hedging" by their activities in the futures markets. They were pure speculators seeking to make money at the expense of others in the marketplace.

Goldstein has a B.A. degree in economics from the University of Cambridge, England, an M.A. in economics from Yale, a Master of Philosophy degree in economics from Yale, and a Ph.D. in economics from Yale. Prior to entering the futures market, Goldstein had been employed by ATT as a member of an analysis group for "micro economics and finance issues." Deposition of Abraham R. Goldstein, Dec. 30, 1986 ("Goldstein Dep.") at 8. In the early 1980's, Goldstein formed Natra Trading Corporation and Natra–Hudson Management Co., Inc., Goldstein Dep. at 6–10, both of which were involved in trading in the futures markets.

Apfel has a B.S. degree in finance from New York University and thereafter completed half the requirements for a Master's degree in finance at New York University. In 1978, he first became employed in the futures market. He started by working as an assistant trader for Lasker, Stone & Stern, an FCM and member of COMEX. He next went to the Wilshire Group where, for two years, he traded "commodities, bonds, metals and some of the gold commodities." Deposition of Ronny Apfel, Dec. 29, 1986 ("Apfel Dep.") at 8–9. From there, he was employed for one year by Natra Trading, one of the corporations run by Goldstein.

In early 1984, Apfel and Goldstein formed Flo–Arb, which was, as I indicated, a duly registered FCM and through one of its partners (Apfel) a floor member of CO-MEX. Goldstein testified at his deposition that the partners viewed Flo–Arb as a "specialist" in the futures markets of the Commodities Exchange, making a market where others would not.

It should be clear from the above recital that Apfel and Goldstein, the plaintiffs here, were fully cognizant of all of the potential risks of the futures markets. They should have been particularly aware of the riskiness of futures market since they knew that they did not have sufficient capital to be an active floor broker on CO-MEX or a member of CCA. In order to act as a floor broker, Flo–Arb had to have its accounts guaranteed by, and cleared through, Volume, which was a member of CCA.

In setting up the Flo–Arb account at Volume, both Goldstein and Apfel signed a "Risk Disclosure Statement" that, *inter alia*, contains the following statement:

(1) You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds on short notice in order to maintain your position. If you do not provide the required funds within the prescribed time, your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

COMEX Clearing Assoc. Inc.'s Notice of Cross–Motion for Summary Judgment ("COMEX Cross–Mo."), Affidavit of Saul Dworkin ("Dworkin Aff."), Exh. A. at 13 and 33.

Both Goldstein and Apfel were aware that the CCA viewed all of Volume's accounts (whether house accounts or for customers like Flo–Arb) as the accounts of one member. The CCA does not differentiate between the types of accounts held by any member, and Goldstein and Apfel had to be aware that there was a risk clearing through another FCM. Specifically, if the clearing FCM went broke, the accounts held would be netted by CCA with the possible result that the customers would lose everything.

### IV. *Summary of the Collapse of Volume Investors*

Volume permitted other customers, the Westheimers, and their agent to have a

large number of gold futures contracts. Following a dramatic change in gold prices the Westheimers were caught short and were unable to come up with the amounts required to maintain their margin accounts. The amounts necessary were so enormous that Volume was also unable to meet the margin demands of CCA, which had netted all of the Volume accounts, including those of the Westheimers. Because of the Westheimers, Volume was broke and CCA sold out all the Volume accounts. In effect, everyone connected with Volume lost and the problem became how to spread the loss equitably among all of the victims. By this point this court was involved both directly and through its receiver. While there was no precedent on point that could guide me in this task, I decided that it would be most appropriate and fair to analogize this situation to the rule of "general average" found in the law of Admiralty.

"General average" is perhaps the oldest, still extant, doctrine of the law of Admiralty. It is used when a ship loses some of its cargo due to the perils of the sea. In that situation the remaining cargo is liquidated and each of the cargo owners, regardless of whose cargo was lost, and the ship owner share the monetary loss. Throughout history, beginning at least with the Greeks and the Phoenicians, this has been considered a fair and equitable method of resolving the problem. The liquidation and distribution of Volume was effected according to this time-honored principle and each step was taken with the approval of this court.

## V. *The Claims of the Parties*

1. *Flo–Arb v. Volume,* 85 Civ. 3562.

Flo–Arb, unwilling to accept the equitable distribution of Volume, instituted this action against the estate of Volume claiming a breach of contract in the following respects: (1) by revocation of its guarantee of Apfel whereby Apfel could no longer work as a floor broker; (2) by refusing to transfer Flo–Arb's account to another FCM; (3) by allowing Flo–Arb's accounts to be frozen and then liquidated; (4) by permitting Flo–Arb's cash and securities to be used by Volume to meet the margin requirements of the clearing association; and (5) by failing to maintain sufficient capital so that Flo–Arb could continue in business. Flo–Arb also complains about the manner in which its accounts were liquidated. Both sides now move for summary judgment on Flo–Arb's claims.[3]

2. *CCA v. Flo–Arb,* 85 Civ. 3662.

The CCA, as successor to the receiver of Volume, has a separate action against Goldstein and Apfel for a deficit in their accounts of $1,792,374.51 plus interest and the costs of collection. The CCA moves for summary judgment in this action.

## VI. *Discussion—Flo–Arb v. Volume*

It is necessary to recap, in part, the hectic events of March 19, 20, and 21, 1985. The hectic trading in gold futures on the three days in question was the subject of much talk not only among the FCMs and the members of COMEX, but also among the public. What the public was unaware of, but what was known to the members of COMEX, was that the Westheimers were heavily invested in gold futures through Volume and that the Westheimers might not be able to meet their margin calls. Others at COMEX recognized the possibility that Volume might fail as well.

At least until the close of trading on March 20, 1985, Apfel, acting on behalf of Flo–Arb, remained active on the floor of COMEX. He traded as a floor broker and used Volume as the clearing agent. At the close, Flo–Arb was in deficit equity with Volume in the amount of $445,000. Flo–Arb did not have a margin call for this amount because it executed a "box" trade, a device used by some COMEX members to delay such a margin demand.

On the morning of the 21st, some of the principals of Volume told Goldstein and

**3.** All other claims have been conditionally dismissed and have been held in abeyance pending the disposition of these cases.

Apfel of Volume's financial situation. At that time and up until 11:00 that morning, Flo–Arb could have transferred its account to another FCM. Such a transfer did not take place.

Volume's financial plight did not escape those in charge of COMEX. Volume was told that it was no longer in a position to guarantee anyone as a floor broker and the officials of COMEX ordered Volume to terminate any guarantees. Even so there is some proof that Apfel stayed on the trading floor and continued executing trades almost to the end of trading on March 20, 1985. Even if Apfel had thereafter been stopped from acting as a floor broker, it is clear that until 11:45 on the morning of March 21, 1985, Flo–Arb could have liquidated its Volume account through other FCM-floor brokers. Flo–Arb did not do so. Perhaps Flo–Arb delayed in recognition that, because an "off-floor" or "upstairs" customer must pay the floor broker's commission, "off-floor" trading is more expensive than "on-floor" trading. In any event, Flo–Arb did not move its accounts from Volume nor take steps to liquidate them.

At 11:45 a.m. on March 21, 1985, Volume was suspended from COMEX and CCA. All of its accounts were then frozen.

■ The above recitation indicates that there is no merit to two of the breaches of contract alleged by Apfel and Goldstein. First, the claim that Volume breached its contract by revoking the floor-brokerage guarantee for Apfel and Flo–Arb is unsupported. Volume was broke at that point and could guarantee nothing. COMEX ordered the guarantee rescinded. There was no breach of contract—there was impossibility of performance.

■ Similarly, there is no basis for the alleged refusal to transfer Flo–Arb's account. Apfel and Goldstein had more than adequate opportunity to transfer the Flo–Arb accounts even after they were apprized of Volume's financial difficulties. They did not do so. They will not now be heard to complain that Volume did not transfer the account.

■ This result is not changed by CCA's by-laws. At the time the by-laws provided:

if a Clearing Member whose clearing privileges are terminated is a futures commission merchant, the Corporation shall endeavor to transfer to one or more other Clearing Members the open contracts of customers of such futures commission merchant in lieu of closing out the same. . . .

Reply Memorandum of Flo–Arb Partners, Ronny Apfel and Abraham Goldstein In Support of Their Motion For Summary Judgment and In Opposition to the Cross-Motion of COMEX Clearing Assoc., Inc. For Summary Judgment at 5 n. * (quoting CCA By-laws and Rules, Section 6.1(f)(iv)). This by-law does not envisage a total and immediate liquidation of a member of CCA. It was intended to cover the more leisurely situation where a member is phasing out of the business by reason of retirement or some other nonemergency cause.

In any event, there is no doubt in my mind that no clearing member would be willing to take a customer like Flo–Arb with a substantial capital deficit. Flo–Arb and its partners are unable to point to anyone who was willing to do so in March 1985. It would make no sense for a businessman to do so. During the "capital crunch" in the investment community in 1969–72, when there were many mass transfers of customer accounts in the securities industry, there was not one situation where a broker took on a customer in substantial deficit without a guarantee from a third party. There were no such guarantees to be had for the Volume customers and there certainly was no such guarantee forthcoming for Flo–Arb, Apfel, or Goldstein.

■ This brings us to the last alleged breach of the contract by Volume, that is, that the freezing of its accounts and their liquidation was somehow improper. The short answer to this claim is that the freezing of the accounts and their liquidation was done by court order and do not constitute any breach of contract for which Flo–Arb, Apfel, or Goldstein may recover.

The contract under which Apfel and Goldstein make their claim is the customer agreement. That signed agreement provides:

> 3. APPLICABLE RULES AND REGULATIONS. Any and all transactions under this agreement shall be subject to the constitution, by-laws, rules, regulations, orders, and customs and usages of the exchange or market where executed (and of its clearing house, if any), and to the provisions of the Commodity Exchange Act, as amended, and to the rules, regulations and orders promulgated from time to time thereunder, and to all applicable federal and state laws and regulations. Volume, its officers, directors, employees, and agents shall not be liable to the undersigned as a result of any action taken by Volume, its officers, directors, employees, and agents which is necessary to comply with any such constitution, by-law, rule, regulation, order, custom, usage, act, or statute.

Dworkin Aff., Exh. A at 1–2.

The complained of actions were taken pursuant to an "order" within the meaning of this provision. Because the contract specifically provides that "Volume ... shall not be liable to [Flo–Arb] for ... any action ... necessary to comply with such ... order," this suit against the estate of Volume must fail.

Contrary to what is asserted in their brief, Flo–Arb and its Partners were treated justly throughout. Accepting as they did the risks of the futures business meant that they also accepted the risks inherent in having their trades cleared through Volume as FCM.

The CCA looked to Volume as if Volume were a principal in all its transactions. All of the trades for Volume and its accounts were netted. When liquidation was required, it happened. Neither CCA nor the receiver had any duty to make sure the "straddles" placed by Flo–Arb were treated separately from the rest of the transactions being cleared for Volume. Indeed, to do so would have given Flo–Arb an unfair and unjust preference over all of Volume's other customers.

■ Yet, the arguments raised by Flo–Arb resolve themselves into just that proposition, viz, because Flo–Arb and its partners did not receive an unfair and unjust preference from Volume and its receiver in the liquidation, Volume breached a contractual duty to Flo–Arb. There is no substance to this argument. Nor is there substance to the claim that Volume somehow breached a contractual duty by failing to have sufficient capital to meet all CCA margin requirements for all of its customers and permit Flo–Arb to continue trading.

The claim that Volume should not have used customer cash and securities to meet CCA margin demands ignores the fact that Apfel and Goldstein had actual knowledge that members of CCA are treated by the association as principals for all transactions, whether acting as principal or for a customer. Of course, this means that all CCA members use the cash and securities posted by customers as margin for the account at CCA. Apfel and Goldstein knew this also. Their claim of some breach of contract based on this practice is without merit.

■ Likewise, Flo–Arb's claims under the Commodities Exchange Act must fail. The method of liquidation of the Volume account at CCA was clearly permissible and not a violation of the Commodities Exchange Act. The allegation of Volume's violation of the rules covering the number of positions in the Westheimers' accounts is simply insufficient to give rise to a private cause of action. That rule does not cover fraud or manipulation. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Rather, it was intended to protect the exchange and the CCA and cannot be said to be for the "especial benefit" of a class to which Flo–Arb and its partners belong. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

Having found that there is no substance to the claims under Flo–Arb's complaint, it follows that summary judgment must enter dismissing the Flo–Arb complaint and as-

sessing costs against Flo–Arb and its partners jointly and severally.

### VII. *Discussion—Volume v. Flo–Arb*

■ Flo–Arb resists summary judgment on the action against it and its partners for the deficit left in its account after the liquidation of Volume. Much of this resistance is posited on two incorrect positions. Thus, Goldstein in his reply affidavit first states:

> Because Flo–Arb did not default on any of its obligations to Volume, Volume had no legal right to liquidate, or allow the liquidation of, Flo–Arb's positions, and any deficit allegedly resulting from that liquidation is Volume's fault and its responsibility.

Goldstein Affidavit ("Goldstein Aff."), dated Jan. 22, 1987 at ¶ 3.

This position and all of the arguments built on it ignore reality. No one has suggested that the collapse of Volume was caused by Flo–Arb. Indeed, it is irrelevant. Volume's accounts were not liquidated because of some fault on the part of Flo–Arb or its partners. Rather, they were liquidated because Volume could not meet the CCA's margin requirements. Flo–Arb in first entering its arrangements with Volume assumed that risk along with the sundry other risks that the futures markets entail. In speculating in the market, Flo–Arb accepted the risk of losing its money. If Flo–Arb's trading resulted in this loss, the loss would be assessed without regard to blame. So also, here, it is totally unnecessary to assess blame and the absence of "fault" (in that sense) is irrelevant.

■ Second, Flo–Arb, in a shift of its position between the original motion and its reply papers, argues:

> For purposes of our summary judgment motion, the Court need not resolve the question of whether the liquidation of Volume's accounts was proper, but must instead decide whether the losses resulting from that liquidation should be borne by Volume's estate, or be assigned to non-defaulting customers like Flo–Arb who are innocent of any wrong doing in connection with Volume's failure.

Goldstein Aff. at ¶ 5. Once again this argument seeks to duck reality under a cloak of asserted innocence. Innocence or blame is irrelevant in this case. Flo–Arb would have the world believe that when the Volume accounts were liquidated and its customers paid out or assessed for deficits under the modification of the rule of general average that I imposed, there were only two entities involved—Flo–Arb and Volume. This is not true. There were other customers—members of the public, not FCMs like Flo–Arb, who are arguably more innocent than Flo–Arb or its partners. Under the general average, these customers were entitled to moneys from those customers in deficit (like Flo–Arb) so that the general average could be struck.

Flo–Arb has successfully delayed paying what it owes to the estate of Volume for redistribution to the truly innocent public customers. To obviate any bad public relations, CCA has already put up the money owed to public customers under the rule of general average. This permitted the public to be paid without delay arising from the arguments of Flo–Arb. By making the payment to the public customers, CCA has succeeded to their interests and now can collect from Flo–Arb through the estate of Volume.

■ Finally, I turn to the last real argument raised by Flo–Arb against the assessment of the deficit in its accounts—that is that this court should ignore the prices in the real market place and instead put total reliance on "prices" derived from a theory espoused by Goldstein as to what he thinks the market should have been. The type of theorizing that is suggested by Flo–Arb and its partners is simply not appropriate.

Rule 6.1(g) of the CCA, approved by CFTC and in effect at the time of interest here, provides, in pertinent part:

> (g) The open contracts of a Clearing Member which, pursuant to Section 6.1(f) [providing for the liquidation of a Clearing Member's positions upon the suspension of its clearing privileges], are required to be closed out pursuant to this Section 6.1(g), shall be closed out as follows:

(i) The net open contracts carried by the Corporation for the account of such Clearing Member shall be closed out by transactions effected on the floor of the Exchange through one or more Exchange members selected by the Corporation;

(ii) If any net open contracts described in Section 6.1(g)(i) constitute straddles which are executed on the basis of the price differential between the two parts of the straddle, the Corporation shall establish a liquidation price for each such transaction as follows:

(A) The liquidation price for that part of the transaction which has the nearer maturity shall be the settlement price for that maturity on the day such close out is effected; and

(B) The liquidation price for that part of the transaction having the more distant maturity shall be the liquidation price determined pursuant to Section 6.1(g)(ii)(A) plus or minus, as the case may be, the price differential between the two parts of the straddle.

(iii) The remaining open contracts carried by the Corporation for the account of such Clearing Member shall be closed out by entries on the records of the Corporation (including, without limitation, pairing and cancelling offsetting long and short positions in the same maturity month of the same commodity contract) at a liquidation price equal to the weighted average liquidation price at which contracts in the same commodity and maturity month are closed out pursuant to Section 6.1(g)(i)....

\*　　\*　　\*　　\*　　\*　　\*

All such close outs made pursuant to this Section 6.1(g) shall be for the account and risk of the Clearing Member whose clearing privileges have been terminated and neither such Clearing Member nor any other person shall have any claim or right against the Corporation regarding the manner in which or the price at which contracts have been closed out pursuant to this Section 6.1(g).

COMEX Cross–Mo., Affidavit of John L. Wyer, Exh. A.

The liquidation of Volume's accounts proceeded strictly according to the method set out in this rule. It should be noted again that the liquidation of Volume proceeded as if Volume was the principal in all transactions. Thus, a straddle put on Flo–Arb would not be identified as such and it would not necessarily be liquidated as a straddle; it would be treated as part of the overall Volume inventory.

After the liquidation of the Volume accounts, the receiver fairly assigned the amounts found receivable to the customers of Flo–Arb. There is no dispute as to that. Nor is it disputed that the receiver found Flo–Arb and its general partners owed $1.7 million to Volume. In so doing, the receiver used the prices that the positions liquidated actually fetched from CCA and, using the accounting principles normally followed by the industry, properly struck the mathematical balance now claimed.

■ This leaves only one question; CCA seeks not only the $1.7 million but also the costs of collection. Paragraph 11 of the Customer Agreement that was signed on behalf of Flo–Arb by both Goldstein and Apfel provides:

LIABILITY FOR COST OF COLLECTION, The undersigned shall be liable for and shall promptly pay all reasonable costs and expenses of collection of any debit balance or any unpaid deficiency in any of the undersigned's accounts with Volume, including but not limited to attorney's fees incurred and paid or payable by Volume.

Dworkin Aff., Exh. A at 3. Pursuant to this section of the agreement, Flo–Arb and its partners Goldstein and Apfel are liable for the expenses of both of the actions covered by this opinion.

The remainder of Flo–Arb's arguments do not merit discussion. Suffice it to say that I find that they are either inapposite or are dealt with in the earlier portion of this opinion regarding *Flo–Arb v. Volume*.

## CONCLUSION

For the foregoing reasons, Flo–Arb's motion for summary judgment in 85 Civ. 3562

is denied and Volume's motion for summary judgment in that action is granted.

CCA's motion for summary judgment in 85 Civ. 3662 is also granted. The CCA is directed to submit in affidavit form a breakdown of the costs of collection (to date) of the sums found due and owing. This submission is to be made within ten (10) days of the date this opinion is filed. Flo–Arb and its partners can file whatever objections to the sums claimed for "collection costs" within five (5) days after the CCA submission. Form judgments are to be included in the documents submitted.