**In re GRIFFIN TRADING COMPANY, Debtor.**

**Bankruptcy No. 98 B 41742.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 25, 2000.

David N. Missner, Janice L. Duban, Piper, Marbury, Rudnick & Wolfe, Chicago, IL, for Movant.

Bryan Krakuer, Anne Marie Bredin, Sidley & Austin, Chicago, IL, for Respondent.

Catherine Steege, Jenner & Block, Chicago, IL, for Walsh Claimants.

R. Scott Alsterda, Robert H. Griffith, Ungaretti & Harris, Chicago, IL, for MDNH & Engmann Options.

Glynn L. Mays, Senior Assistant General Counsel, Office of General Counsel, Washington, DC, for CFTC.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the motion of the Trustee (the "Trustee") of the Estate of Griffin Trading Company ("Griffin"), a bankrupt commodities broker incorporated under Delaware law. Griffin's principal place of business was in Chicago, Illinois, but Griffin also had an established branch in London, England.

Because there is a shortfall in certain of Griffin's customers' accounts, the Trustee

seeks authority to use all estate assets to pay the claims of Griffin's customers (the "Customer Claims") in full, in priority to all other unsecured creditors, pursuant to the provisions of Subchapter IV of Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, the Commodities Exchange Act (the "CEA"), 7 U.S.C. § 1 *et seq.*, and the rules and regulations of the Commodity Futures Trading Commission (the "CFTC"), 17 C.F.R. § 1.1 *et seq.* The CFTC supports the Trustee's position. The Customer Claims all arose through trading activities carried out, if not ordered, in Griffin's London office (the "London Office"). If the Trustee's motion is granted, all estate assets will be used to pay the Customer Claims; there will be no assets available for distribution to Griffin's general creditors.

One general (i.e., non-customer) creditor, MeesPierson N.V. ("MeesPierson"), has objected to the motion on two grounds. First, MeesPierson objects to the Trustee's choice of law, arguing that English, and not United States, bankruptcy law should apply to the distribution of estate assets to customers whose claims all arose as a result of trades executed in London. Secondly, MeesPierson asserts that even if U.S. law applies to the distribution of Griffin's assets, the CFTC has exceeded its statutory authority to regulate commodity broker bankruptcies, granted in 7 U.S.C. § 24.

Under U.S. law, which the Trustee seeks to apply, customer property comes under the trustee's control, *see* 11 U.S.C. § 761(10), 11 U.S.C. § 766. Customers receive the highest priority, subject only to payment of certain administrative expenses, 11 U.S.C. § 766(h), in the distribution of segregated customer accounts and other property that is "customer property," a term defined in the Code, 11 U.S.C. § 761(10), and in the CFTC Regulations, 17 C.F.R. § 190.08. The CFTC's definition is considerably broader than the Code's definition and the parties disagree about which one should apply.

Under either definition, only after the administrative expenses and customer claims have been paid in full would "customer property" be available to pay other creditors of the estate. 11 U.S.C. § 766(j)(1). Congress, in drafting § 766(j)(1), admitted that an excess of customer property would be an "unlikely event," H.R.REP. No. 95–595, at 393 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6349 or a "rare case," 124 CONG. REC. H11099 (daily ed. Sept. 28, 1978); S 17416 (daily ed. Oct. 6, 1978) (statements of Rep. Edwards and Sen. DeConcini).

In the far more likely event that there are insufficient funds in customer accounts to pay customer claims in full, the Bankruptcy Code provides that "if a customer is not paid the full amount of such customer's net equity claim from customer property, the unpaid portion of such claim is a claim entitled to distribution under section 726 of this title." 11 U.S.C. § 766(j)(2). Section 726 of the Bankruptcy Code sets forth the scheme for distribution of the debtor's assets to unsecured creditors. However, the CFTC has expanded the Code's definition of "customer property." It has provided by regulation that when there is a shortfall in customer property as defined by the Code ("Code Customer Property"), virtually all estate property is to be treated as customer property, thus giving the customers first priority in its distribution, until all customer claims have been paid in full. 17 C.F.R. § 190.08(a)(1)(ii)(J). In this case, the shortfall in customer property exceeds the total amount available for distribution. If U.S. law applies, the customers would receive everything and the general unsecured creditors would receive nothing.

Under English law, customer property in segregated accounts never becomes part of the bankruptcy estate, but remains segregated to the customers to the extent that those accounts are actually funded. However, if there is a shortfall in those accounts, the injured customer is treated as a general unsecured creditor as to the

shortfall. Thus, under English law, the customers and MeesPierson would share in a *pro rata* distribution of estate property. MeesPierson's $4.7 million dollar claim is by far the largest claim against the estate. If English law applies, the customers would receive a substantially smaller distribution on their claims, but MeesPierson might receive as much as half of its claim.

In the alternative to its choice of law argument, MeesPierson argues that the CFTC's definition of "customer property," 17 C.F.R. § 190.08, impermissibly alters and expands the definition of "customer property" provided in the Bankruptcy Code at 11 U.S.C. § 761(10). MeesPierson further argues that the CFTC's definition of "customer property" renders meaningless § 766(j)(2) of the Bankruptcy Code, which provides that customer claims not paid out of customer property are claims entitled to distribution only as general unsecured claims. 11 U.S.C. §§ 766(j)(2), 726, 510, 502. It should be noted that except for the provisions of 17 C.F.R. § 190.08(a)(1)(ii)(J) (the "Challenged Regulation"), English and U.S. laws governing the distribution of assets in the event of a shortfall in customer property are functionally equivalent.

For the reasons expressed in the following opinion, the Court concludes that U.S. law is the applicable law in this case. The Court further concludes that the CFTC exceeded its statutory grant of rulemaking authority and that the provisions of 17 C.F.R. § 190.08(a)(1)(ii)(J) are invalid. Pursuant to the provisions of Subchapter IV of Chapter 7 of the Bankruptcy Code, any shortfall in customer property as defined in that Subchapter must be treated as a general unsecured claim. The Trustee's Motion to Use Estate Assets to Pay Customer Claims in Full is accordingly denied.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(b) and 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue lies under 28 U.S.C. § 1409.

## BACKGROUND

### *The Basic Mechanics of a Commodities Trade*

Griffin was what is known in the U.S. as a "futures commission merchant" ("FCM") and in the United Kingdom ("U.K.") as a "futures broker." The Commodities Exchange Act defines an FCM as:

> an individual, association, partnership, corporation, or trust that—
>
> > (A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market; and
> >
> > (B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(12). In the U.S., Griffin's trading activities were regulated by the CFTC. In the U.K., Griffin's trading activities were regulated by the Securities and Futures Authority ("SFA").

> A "future" or "futures contract" is:
>
> an agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) which obligates each party to the contract to fulfill the contract at the specified price; (3) which is used to assume or shift price risk; and (4) which may be satisfied for delivery or offset.

Commodity Futures Trading Commission, *The CFTC Glossary: A Layman's Guide to the Language of the Futures Industry* <http://www.cftc.gov/opa/brochures/glossary.html>. Futures transactions are highly leveraged and very risky. Commodity Futures Trading Commission, *Futures*

*and Options–What You Should Know Before You Trade* <http://www.cftc.gov/opa/brochures/futures.html>.

An individual may not trade directly on a commodities exchange unless he or she is a member of that exchange. Further, anyone executing trades in the U.S. must be registered with the CFTC as a floor trader. 7 U.S.C. § 6e. Individuals who want to trade commodities must do so through a "broker" as the broker's "customers." A "broker" is a person or entity paid a fee or commission for executing buy and sell orders for a customer. *CFTC Glossary* <http://www.cftc.gov/opa/brochures/glossary.html>. The term "broker" may refer to "floor brokers," who actually execute trades on an exchange floor, "account executives," who are the in-office contacts for customers of FCMs, and FCMs themselves. *Id.*

When a customer places an order with the broker, the broker executes the trade by forming a contract with another exchange member on the appropriate exchange. The buying member and the selling member then "clear" the trade by separately submitting details of the trade for matching by the exchange "clearing house." A "clearing house" settles exchange transactions and oversees compliance with the exchange's delivery procedures and financing of the trade. *Id.* "Clearing" is the novation process through which "the clearing house or association becomes the buyer to each seller of a futures contract and the seller to each buyer, and assumes responsibility for protecting buyers and sellers from financial loss by assuring performance on each contract." *Id.* In other words, where there was one contract formed in the trade between the buyer and the seller, after clearing, there are two contracts: one between the seller and the exchange and the other between the buyer and the exchange.

Once the broker places the customer's trade, the broker will call upon the cus-

tomer for an "initial margin" payment. "Initial margin" is generally some small percentage of the total contract price offered as security for contract performance. The broker usually transfers the initial margin from funds which the customer has deposited with it for this purpose. If there are not enough funds in the account to cover the margin call, the broker will require the customer to make an additional deposit.

Only clearing members of an exchange may submit trades to the clearing house for clearing. Not all brokers are clearing members of all exchanges. If a broker is not a clearing member of a given exchange, the broker must submit its trades, including those of its customers, to a clearing member for submission to the exchange's clearing house. The submitting broker will then owe an initial margin payment to the clearing member, who will owe initial margin to the exchange.

At the close of the trading day, another series of margins falls due. These margins may be "variation margin payments" or "variation margin calls," depending upon whether the customer has made or lost money on his open position or contract. If the customer has made money, the clearing house will make a variation margin payment to its member, who will pay the submitting broker, who will pay the customer's account. If the customer has lost money, the clearing house will demand payment of the loss from the clearing member, who will demand payment from the submitting broker, who will debit the customer's account for the loss or demand payment from the customer if the assets in the customer's account are insufficient to cover the loss.

Thus, one simple trade ordered by a broker's customer creates an entire stairstep series of relationships and obligations. An individual or entity trading through a broker is the broker's customer. If the broker is not a clearing member on a particular exchange, the broker must clear its customers' orders through a clearing

member. The broker becomes the clearing member's customer. The clearing member is the clearing house's customer. Each customer owes initial and variation margin to the entity one level up and each entity is responsible for its customer's obligations, whether or not the customer meets its obligations. Essentially, each broker and clearing member becomes obligated for the debts of the customers on the steps below it.

### The Parties

In the U.S., Griffin was a clearing member of and traded on the Chicago Board of Trade ("CBOT") and the Chicago Mercantile Exchange ("CME"). In London, Griffin was a member of the London Clearing House ("LCH") and a clearing member of the London International Financial Futures and Options Exchange ("LIFFE"). Griffin also traded on the German exchange, Eurex Deutschland ("EUREX"), but was not a clearing member of this exchange. Therefore, Griffin had to clear both its own trades and those of its customers through an entity that was a clearing member of EUREX. Griffin cleared its EUREX trades through MeesPierson.

The Customer Claims at issue all arose from a shortfall in the customer accounts of Griffin's London office, where Griffin held customer money to be used for trading on exchanges outside the U.S., including LIFFE and EUREX.[1] Griffin executed all such foreign trades through its London office. This does not mean that all the Customers holding claims were physically present in Griffin's London of-

fice or that they had direct contact with the London office. Mark J. Walsh, Eva Walsh, and Mark J. Walsh Global L.P. (collectively, the "Walsh Claimants") are the customers holding the largest Customer Claim, in the amount of $3,377,220.97. The Walsh Claimants are U.S. citizens residing in the U.S., who contracted with Griffin's Chicago office, and who placed all their orders through E D & F Man in New York. MDNH Partners ("MDNH") and Engmann Options ("Engmann") were Griffin customers who traded primarily on the CME, but who also ordered contracts to be executed on LIFFE. The Walsh Claimants, MDNH, and Engmann all cleared their trades through Griffin. Account statements show that Griffin held money belonging to the Walsh Claimants, MDNH, and Engmann in the London Office's customer accounts and that these customers were aware that some of their funds were held in London. (Walsh Claimants' Supplemental Aff. Ex. B; Aff. of Michael Engmann and Herbert Kurlan in Further Support of Trustee's Motion Exs. A, B, D). Engmann and MDNH signed a contract with Griffin's London office that expressly provided that money held by Griffin would be treated in accordance with U.K. client money rules. (Aff. of Engmann and Kurlan Ex. C at ¶7.6). Griffin provided all customers trading on foreign exchanges with a Risk Disclosure Statement informing them that their funds would be subject to foreign rules. The Walsh claimants state that they did not execute any documents from the London office, but many of the account state-

---

1. In his Motion, the Trustee referred to those customers with claims against Griffin as "the London Customers" and further stated that "there are no customer claims against the Debtor in the United States." (Trustee's Motion ¶ 15).The Trustee later clarified in open court:

> When we speak about London customers and United States customers, perhaps there is this misnomer going on here. At the time of the bankruptcy, the customers whose claims arose in the United States at Griffin Trading Company in Chicago, Illi-

nois, there were none. Those remaining accounts had been transferred to Kottke and Company prior to the bankruptcy. The only customer claims that remained were customers, United States, citizens whose agreements could have been entered into before the office was established in London or thereafter, but whose trading occurred through the London exchange.... [A]ll of the remaining money that is owed arises from trades that occurred in London, some $9 million worth of claims.

(Transcript Excerpt (A), October 6, 1999).

ments they have submitted prominently bear Griffin's London address and the statement "Regulated by the SFA." (Walsh Supplemental Aff. Ex. B).

### U.S. and U.K. Account Segregation Principles

Although the laws, rules, and regulations governing commodities trading in the U.K. and in the U.S. are substantially similar, they differ in one important respect: the SFA Client Money Rules (the "SFA Rules") do not address the use of one customer's money in the transactions of another, while U.S. law expressly forbids such use. Both countries require the FCM or broker to hold its customers' money in accounts segregated from its own accounts.[2] 7 U.S.C. § 6d(2); 17 C.F.R. § 1.22; SFA Client Money Rule 4–55. However, neither country requires that one customer's funds be segregated from all other customers' funds; both countries expressly allow the broker to pool or commingle all customer funds in one general customer account. 7 U.S.C. § 6d(2); 17 C.F.R. § 1.20(c); SFA Rule 4–56. In the U.K., a customer may opt to have money held in a "designated client bank account," completely separate from all other funds. SFA Rules 4–56, 9–1. Designated accounts cost more to maintain than segregated accounts, and are almost never used. Carla Cavaletti, *Griffin Lessons of Trading*, FUTURES, March 1, 1999, 1999 WL 14051908; Andrew Buncombe and Andrew Garfield, *Trader "Sorry" for Losing £6 Million*, THE INDEPENDENT-LONDON, Jan. 8, 1999, 1999 WL 5973848. The Customer Claims all arise from a shortfall in funds held in pooled customer accounts segregated under the SFA Rules.

In both the U.S. and the U.K., an FCM or broker requires customers to deposit cash or securities with it to margin or support the customer's trading activity. The size of the customer's deposit determines how many "lots" or contracts the customer can buy. In theory, a customer should not exceed the limit imposed by the amount of his deposit, but, in practice, it has happened before, and seems to happen regularly, but briefly, in the normal course of a day's trading.

> A trader's margin deposit is treated as "equity" in his account. A change in the market price of the contract will increase or decrease the equity. If this equity decreases below the "maintenance margin" amount (generally, 75% of the initial margin requirement), the broker will issue a margin call requiring the trader to increase the account's equity to the initial margin level.

Howard Schneider, Mary L. Schapiro, *Regulation of Commodity Futures and Options Trading*, 662 PLI/CORP. 497, 535–36 (1989). When a trader suffers a loss that reduces his ledger balance to a negative number, his loss will not affect the ledger balances of the other customers whose funds are pooled with his, but the loss will affect, even if only momentarily, the sum total of funds actually on deposit in that account. Thus, one trader's loss does not change the book balances of other customers, but it does change the amount of money actually available in the segregated account to pay those book balances.

For example, assume that a broker has ten customers who each deposit $100,000. The broker segregates the funds in a customer account containing $1,000,000 ($100,000 × 10 customers). Customer A places

---

2. Andrea Corcoran, who served as director of the CFTC's Division of Trading and Markets from 1982 until 1997, has explained that:

> Segregation is intended (i) to distinguish clearly funds belonging to a financial intermediary or broker from those belonging to its customers and (ii) to impose a type of trust on the firm's obligation to its customers. The segregation requirement facilitates prompt identification of funds that are not at the disposal of a broker to meet its own financial obligations and that are not available to be set-off against that broker's debts to its own creditors.

Andrea M. Corcoran, *Markets' Self-Assessment and Improvement of Default Strategies After the Collapse of Barings*, 2 Stan. J.L. Bus. & Fin. 265, 273 (1996).

a losing trade that results in a variation margin call of $500,000. Customer A's loss will be paid from the segregated customer account, leaving the account with an actual balance of $500,000 ($1,000,000—$500,000). Customer A's balance in the broker's ledger will be a negative $400,000 (his original $100,000 deposit—the $500,000 loss), while the other nine customers will still have ledger balances of $100,000 apiece. However, at this point, the actual amount in segregation for the nine other customers is only $500,000 (the original $1,000,000—$500,000), or $55,555.55 apiece ($500,000 ÷ 9). Under ordinary circumstances, the broker will make up the shortage from its own funds and call upon the customer to reimburse it.[3] If the customer is unable to reimburse the FCM, the FCM may bear the loss itself. Both the CFTC Regulations and the SFA Rules permit a broker to deposit its own funds into a segregated customer account to maintain segregation requirements. 17 C.F.R. § 1.23; SFA Rule 4–55(2).

In both the U.S. and the U.K., an FCM must compute its customer funds segregation requirements on a daily basis. 17 C.F.R. § 1.32; SFA Rule 4–67(1A). If a U.S. broker cannot meet its segregation requirements, it must immediately report the deficiency to the CFTC and to its designated self-regulatory organization. 17 C.F.R. § 1.12(h). An FCM in the U.K must report to the SFA; failure to meet segregation requirements may result in the SFA issuing an Intervention Order under SFA Rule 7–12. An Intervention Order may, in its most expansive form, forbid a broker from carrying on its business. SFA Rule 7–15.

Both countries also impose capital requirements on brokers or FCMs. 17 C.F.R. § 1.17; SFA Rules 3–60 *et seq.* However, pursuant to a 1988 agreement between the CFTC and U.K. regulatory authorities, certain FCMs in the U.K., of which Griffin was one, must comply with U.S., and not U.K., capital requirements. (Reply of the CFTC at p. 4). FCMs must comply with the minimum financial requirements at all times. 17 C.F.R. § 1.17(a)(2)(ii)(3). An FCM that cannot comply or affirmatively demonstrate that it complies "must transfer all customer accounts and immediately cease doing business as a futures commission merchant until such time as the firm is able to demonstrate such compliance...." 17 C.F.R. § 1.17(a)(2)(ii)(4).

### Events Leading to Griffin's Bankruptcy

On December 29, 1998, a breach of the SFA Client Money Rules in Griffin's London Office led the SFA to issue an Intervention Order prohibiting Griffin from doing business. The actions of one rogue trader, John Ho Park ("Park"), on December 21 and 22, 1998, caused a shortfall in the London Office's segregated customer

---

**3.** William T. Bagley, the first chairman of the CFTC, explained to Congress that this process does not violate the provisions of 7 U.S.C. § 6d(2) or 17 C.F.R. § 1.22, at least when there is sufficient money in the customer account to allow for ledger balance adjustments:

"since money is 100 per cent fungible, a netting out at the clearing house level of one customer's new contracts (or losses) against the closing out of another customer's old contracts (or his profits) can be offset at the at the futures commission level without any violation of regulation 1.22. A simple book transfer is all that's necessary. The futures commission merchant need merely offset the margin calls made on a net basis by the clearing house by making

appropriate adjustments to the interests of A and B in the futures commission merchant's customers' segregated funds bank account, as reflected in his own books and records."

*The Bankruptcy Reform Act of 1978: Hearings on H.R. 31 and H.R. 32 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Cong. Part IV at 2395 (1976); *Hearings on S. 235 and S. 236 Before the Subcommittee on Improvements in the Judicial Machinery of the Senate Committee on the Judiciary,* 94th Cong. Part III at 70 (1975). Bagley did not explain to Congress what would happen if there were not sufficient funds in the account to cover a substantial loss by one or more customers.

funds and caused Griffin to be a defaulter under LIFFE and LCH rules. Park, whose funds on deposit with Griffin supported a limit of 900 lots, bought as many as 11,000 lots of German *bund* futures on EUREX (the "Park Trades"). The Park Trades were a disaster; they lost more than $10,000,000 overnight.

Griffin was unaware that Park had exceeded his limit because, in a manner of speaking, Park slipped the trades through Griffin's back door. Park himself did not execute the trades through Griffin, in which case Griffin would have known that he was so far in excess of his limit, and would, presumably, have acted to halt his trading. Rather, he executed the trades through a third-party broker, Tullett and Tokyo Futures and Trade Options Limited ("T & T"), which then "gave up" the trades to Griffin. A "give-up" occurs when a customer orders a trade through a third-party broker and directs the third-party broker to clear that trade, not through the third-party's clearing member, but through the customer's regular broker. In a give-up situation, the clearing broker may not know who its ultimate customer is; the clearing broker may be aware only of the executing broker's identity. Carla Cavaletti, *A Love–Hate Phenomenon Called Give–Ups,* FUTURES, June 1, 1999; 1999 WL 14052030. Traders often use give-ups to "consolidate many small orders or to disperse large ones." *CFTC Glossary* <http://www.cftc.gov/opa/brochures/glossary.html>. In this case, Park ordered trades through T & T; T & T, rather than clearing the trades through its own clearing member, presented the trades to Griffin, and Griffin, through MeesPierson, cleared the trades in the EUREX clearing house.

When the EUREX clearing house called on MeesPierson for the $10,000,000, MeesPierson in turn called upon Griffin customer accounts. Griffin, after receiving Park's assurance that he would deposit additional funds, made a payment to MeesPierson from the pooled customer accounts. In addition, MeesPierson swept the Griffin customer transaction account on deposit with it and met the balance of the call from its own funds. Only a small portion of the funds paid to or collected by MeesPierson belonged to Park; the rest of it belonged to his fellow Griffin customers. MeesPierson then stair-stepped down to Griffin with the $10,000,000 margin call, which neither Griffin, nor Park, the bottom stair in the series, was able to meet.

As a result of the Park Trades, Griffin was unable to meet the minimum financial requirements imposed both by the SFA and the CFTC. The Intervention Order forced Griffin's London office to stop operating as an investment business. Griffin reported to the CFTC that it no longer met, and was unable to meet, minimum financial requirements. On December 30, 1998, Griffin was placed into Chapter 7 proceedings in the U.S. On January 5, 1999, this Court authorized the Trustee to consent to the filing of a "winding-up" petition in the U.K with respect to Griffin's U.K. operations. According to an order issued by the High Court of Justice in the Chanceries Division of the Companies Court in the U.K., the U.K. liquidation was and remains ancillary to the U.S. bankruptcy proceeding. *In the Matter of Griffin Trading Co. and In the Matter of the Insolvency Act 1986,* Order of the High Court of Justice, Chancery Division, Companies Court ¶ 4 (Jan. 6, 1999).

By December 23, 1998, all Griffin customer accounts with U.S. market positions had been transferred from Griffin to another U.S. FCM. There are no Customer Claims against Griffin resulting from U.S. trading activity. All the Customer Claims at issue here, regardless of the residence or citizenship of any particular customer, arise from trades on foreign markets, executed from accounts that were maintained in Griffin's London Office.

*Rogue Traders in the U.S.*

Having said that U.S. law prohibits the use of one customer's funds for another

customer's transactions, it is necessary to point out that problems similar to those created by Park have arisen in a purely U.S. context. The U.S. prohibition does not fully protect non-defaulting customers from a shortfall in segregated customer funds. In practical effect, U.S. customers are no better protected against a fellow customer's renegade actions than are customers in the U.K. In either country, the entire segregated account is at risk when one customer places trades that he cannot cover and that are too large for the broker to cover either.

On October 22, 1992, two rogue traders at the CBOT vastly exceeded their trading limits and executed trades that forced one clearing firm, Lee B. Stern & Co. of Chicago, to default on an $8.5 million margin call from its clearing house. *U.S. v. Catalfo*, 64 F.3d 1070, 1076 (7th Cir.1995). This loss exceeded the firm's net worth by more than $2 million. *Id.* The company's owner saved it from bankruptcy by paying the debt from his personal funds. Jeffrey Taylor, *Two Are Indicted for a Wild Spree in CBOT Trading*, THE WALL STREET JOURNAL, July 22, 1993, 1993 WL–WSJ 691608. Lee B. Stern & Co. is still in business.

In 1985, a group of three rogue traders exceeded their limits trading gold futures and caused their clearing broker, Volume Investors Corporation ("VIC"), to default to its clearing house on a $14 million margin call. *Wohl v. Westheimer*, 610 F.Supp. 52, 53–54 (S.D.N.Y.1985); Andrea M. Corcoran & Susan C. Ervin, *Maintenance of Market Strategies in Futures Broker Insolvencies: Futures Position Transfers From Troubled Firms*, 44 Wash. & Lee L.Rev. 849, 852–55 (1987) [hereinafter "*Maintenance of Market Strategies*"]. The clearing house's $14 million call exceeded the amount of VIC's assets. *Maintenance of Market Strategies*, at 854. This default was caused by the traders' default to VIC on a $26 million margin call. *Id.*

When VIC could not meet the clearing house's margin call, the clearing house swept $9.8 million, the full amount of VIC's customers' original margin clearing deposits, from VIC's customer account. *Id.* VIC went into receivership rather than into bankruptcy proceedings. *Westheimer*, 610 F.Supp. at 53–54. The receivership obtained a bridge loan, conditioned upon court approval of a settlement of VIC's claims against the traders, and used the proceeds to pay the shortfall in VIC's customer accounts. *Maintenance of Market Strategies*, at 861. In the end, all non-defaulting VIC customers were paid in full. *Id.*

### The Present Position

The U.K. liquidator has distributed or will distribute the funds remaining in Griffin's London customer accounts to those customers. However, the Trustee estimates that the shortfall in these accounts amounts to approximately $4.3 million. The Trustee further estimates that there will be approximately $3.7 million, excluding recoveries from possible causes of action and payment of administrative expenses, in Griffin's bankruptcy estate for payment to Griffin's customers and unsecured creditors. (Trustee's Motion ¶ 12). Griffin has no secured creditors.

### DISCUSSION

Congress, recognizing that bankruptcy proceedings for stockbrokers and commodity brokers present "unique problems," S.REP. No. 95–989, at 3 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5789 created two special subchapters of Chapter 7, the liquidation chapter of the Bankruptcy Code, to handle those problems.[4] *Id.* Subchapter III of Chapter 7, 11 U.S.C. §§ 741–752, addresses stockbroker liquidations and Subchapter IV, 11 U.S.C. §§ 761–766, addresses commodity broker liquidations. Congress created the separate subchap-

---

4. Stockbrokers and commodity brokers may not reorganize under Chapter 11. 11 U.S.C. § 109(d).

ters for securities and commodities brokers because it recognized fundamental differences between the two[5]. Congress further recognized that the Bankruptcy Code would apply to stockbroker liquidations only in very rare cases, but would apply to most commodity broker liquidations.

> Although the rationale for customer protection in the area of stockbrokers and commodity brokers is identical, there are several differences between the two subchapters. A primary difference derives from the scope of protection afforded. There is no analogue of SIPC to insure commodity brokers' customers. Thus the commodity broker liquidation provisions will apply in the vast majority of commodity broker insolvencies in contradistinction to the rare application of the stockbrokers liquidation provisions.

H.R.REP. No. 95–595, at 271 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6229. In introducing the commodity broker subchapter, the Senate explained that:

> With no cohesive policy for guidance, courts dealing with commodity broker bankruptcies have applied existing laws which are not necessarily consistent with the structure of, and may be potentially disruptive of, commodity futures, options, and leverage markets. The rapid growth of the commodity futures markets in recent years has made the development of statutory guidelines for commodity broker insolvencies all the more imperative. According to the commodity futures trading commission (the "Commission" or "CFTC"), "the Commission now regulates an industry where the value of commodities for

which contracts were traded in 1977 exceeds one trillion dollars".

*Id.* at 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5793.

The CFTC was newly-created[6] when Congress enacted the Bankruptcy Reform Act of 1978. Recognizing that regulation of the industry was in its infancy, Congress avoided drafting statutory sections to cover every possibility, but created instead a framework within which the CFTC could make rules. S. REP. 95–989, at 7. The CFTC's rulemaking authority was to be exercised only within the bounds of the policies set in the commodity broker subchapter. *Id.*

The General Provisions of Chapter 1, 11 U.S.C. §§ 101–110, the Case Administration provisions of Chapter 3, 11 U.S.C. §§ 301–366, and the Creditors, the Debtor, and the Estate provisions of Chapter 5, 11 U.S.C. §§ 501–560, all apply to commodity broker liquidations. So do the general liquidation provisions of Chapter 7, except where Subchapter IV makes provisions otherwise.

When a debtor files a petition for relief under any chapter of the Bankruptcy Code, all the debtor's legal and equitable interests in property become part of the bankruptcy estate. 11 U.S.C. § 541(a). In a Chapter 7 case, a trustee takes charge of the estate, 11 U.S.C. § 701–703. The trustee's duties include collecting and managing estate assets and paying them out to the debtor's creditors. 11 U.S.C. § 704.

Several sections of the commodity broker subchapter make express provisions for the treatment of property that is in the debtor's possession at the time of filing,

---

**5.** Congress distinguished between the two, writing that:

> The securities market is well established, fluid, and generally "thick." By contrast, the commodities markets in futures, options, leverage transactions and the like are very thin. Thus while the trustee of a bankrupt stockbroker could reject contractual commitments with little impact on the market, a similar power in the trustee of an insolvent commodity broker could result in

> a ripple effect disrupting the entire market. This result is magnified in the instance of a clearing organization bankruptcy.

H.R.REP. No. 95–595, at 271 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6229.

**6.** The CFTC was created by the Commodity Futures Trading Commission Act of 1974, Pub.L. 93–463, 88 Stat. 1389 (codified at 7 U.S.C. § 4a).

being held for the debtor's customers. Such property includes, but is not limited to, funds on deposit with the debtor to margin trades, the profits accrued from trading, and open commodity contracts. *See* 11 U.S.C. §§ 761(10)(a)(ix) and 766 (defining customer property and ordering its distribution to customers of the debtor). In addition, the CFTC has promulgated regulations to implement the Code's provisions. 17 C.F.R. §§ 190.01 *et seq.*

The first issue before the Court is whether U.S. law or English law should govern the distribution of Griffin's assets to customers who suffered losses stemming from trading activities in Griffin's London office. If English law applies, then the Court need not reach the second issue. The second question is whether the Challenged Regulation exceeds the CFTC's authority to regulate, granted in 7 U.S.C. § 24, and is thus invalid.

### Choice of Law

MeesPierson first argues that English law should apply to the distribution of Griffin's assets because: (1) the Customers consented to the application of English law by acknowledging Griffin's General Terms of Business (the "Terms of Business"), which provide that "[t]hese Terms shall be governed by and construed in all respects in accordance with English Law and the parties agreed to submit to the non-exclusive jurisdiction of the English Courts as regards any claim or matter arising in relation to these Terms" (MeesPierson's Second Supplemental Response, Ex. B ¶ 16) and (2) other documents, such as Risk Disclosure Statements (MeesPierson's Second Supplemental Response, Ex. G), various account statements, and trade confirmations all indicate that trades through the London office would be regulated by the SFA. MeesPierson also argues that English law should apply to the distribution because England has the most significant contacts with the parties and transactions at issue. Finally, MeesPierson argues that English law should apply for reasons of international comity.

### Whether the Customers Consented to the Application of English Bankruptcy Law

Contractual choice of law provisions are generally enforceable if they are reasonable. *Spinozzi v. ITT Sheraton Corp.,* 174 F.3d 842, 846 (7th Cir.1999); *Kuehn v. Children's Hospital, Los Angeles,* 119 F.3d 1296, 1301 (7th Cir.1997). However, they should only be enforced in the situations where they apply.

Paragraph 16 of the Terms of Business by its own language applies only to the interpretation of the Terms of Business and not to matters outside those Terms. The Terms of Business set forth the respective responsibilities of Griffin and its customers and state the terms under which broker-customer transactions will be carried out. For example, ¶ 7.2 of the Terms of Business provides in part that "Griffin shall credit to the Customer's account all profits from Transactions entered into by Griffin with or for the Customer.... Amounts to be credited to the Customer's account shall be credited as soon as reasonably practical after they have been received by Griffin." (MeesPierson's Second Supplemental Response ¶ 7.2). If Griffin had failed to credit a customer's profits in a timely manner, that customer might well have an action against Griffin for breach of the Terms of Business. Paragraph 16 provides that English law would govern that action. It does not provide that English law will govern the entire relationship between the parties or the operation of Griffin. It does not govern every legal proceeding in which Griffin might be involved regardless of the proceeding's relationship to the Terms of Business.

This is a bankruptcy proceeding and not a suit for breach of the Terms of Business. No Griffin customer has complained to this Court of breach. MeesPierson, who seeks to enforce the choice of law provision, is not a Customer and is not even a party to the Terms of Business. The Terms of

Business do not dictate the choice of law in this bankruptcy proceeding.

The Risk Disclosure Statement and the various statements and confirmations are also inapplicable to this proceeding. The Risk Disclosure Statement alerts the potential customer:

The risk of loss in trading foreign futures and foreign options can be substantial. Therefore, you should carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade foreign futures or foreign options, you should be aware of the following:

1) Participation in foreign futures and foreign options transactions involves the execution and clearing of trades on or subject to the rules of a foreign board of trade.

2) Neither the Commodity Futures Trading Commission, the National Futures Association nor any domestic exchange regulates activities of any foreign board of trade, including the execution, delivery and clearing of transactions, or has the power to compel enforcement of the rules of a foreign board of trade or any applicable foreign law....

3) For these reasons, customers who trade foreign futures and foreign options contracts may not be afforded certain of the protective measures provided by the Commodity Exchange Act, the Commission's regulations and the rules of the National Futures Association and any domestic exchange.... In particular, funds received from customers for foreign futures or foreign options transactions may not be provided the same protections as funds received in respect of transactions on United States futures exchanges. Therefore, you should obtain as much information as possible from your account exec-utive concerning the foreign rules which will apply to your trading....

(MeesPierson's Second Supplemental Response, Ex. G). Absolutely no statement in this Risk Disclosure Statement can be read as a contractual choice of law provision, much less as a provision that English bankruptcy law will govern in the event of Griffin's bankruptcy. It is merely a warning that foreign transactions, i.e., the purchase or sale of contracts or options, will be subject to foreign regulations and that the customer will be unable to call upon the CFTC for assistance if something should go wrong with such transactions. Further, it is a warning that foreign brokers may not handle customer money in the same way as U.S. brokers would.

Nor do the account statements and trade confirmations indicate that English bankruptcy law should apply. They indicate only that the Walsh Claimants, MDNH, and all the customers trading through Griffin's London office knew or should have known that the SFA regulated the London office's trading activities. Quite simply, bankruptcy proceedings are not trading activities. The Customers did not consent to the application of English bankruptcy law.

### Whether U.S. or English Bankruptcy Law Applies Under Conflict of Law Principles

■ The parties have not addressed the issue of whether state or federal choice of law principles should apply in this case. Federal courts sitting in diversity jurisdiction apply the choice of law rules of the state in which they sit. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Spinozzi,* 174 F.3d at 844. However, bankruptcy courts do not have diversity jurisdiction; they have federal question jurisdiction. Several circuits have applied federal common law principles to choice of law questions in federal question cases. *See, e.g., Prudential Ins. Co. of America v.*

*John Doe*, 140 F.3d 785, 791 (8th Cir.1998); *Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1297 (9th Cir.1997); *Edelmann v. Chase Manhattan Bank*, 861 F.2d 1291, 1294 (1st Cir.1988); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980); *see also, Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 12–13 (2d Cir.1996) (collecting cases and discussing the unsettled state of the law in this area).

This Court need not decide whether to apply state or federal choice of law principles, because, in Illinois, the state and federal analyses are the same. *See Excell, Inc. v. Sterling Boiler & Mechanical, Inc.*, 106 F.3d 318, 320–321 (10th Cir.1997) (declining to decide whether state or federal principles controlled because Washington law and federal law treated the question the same way); *Shell·v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1229 (6th Cir.1995) (declining because Ohio and federal principles were the same). Illinois has adopted the "most significant relationship" test of the Second Restatement of Conflicts. *Wildey v. Springs*, 47 F.3d 1475, 1481 (1995); *Ingersoll v. Klein*, 46 Ill.2d 42, 49, 262 N.E.2d 593, 597 (Ill.1970). The federal choice of law analysis uses the same test. *Chuidian v. Philippine Nat'l Bank*, 976 F.2d 561, 564 (9th Cir.1992).

Before deciding which relationship is most significant, however, courts must "characterize the issue at hand in terms of substantive law." *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 (7th Cir.1996). A court must classify the facts before it "under appropriate legal categories and specific rules of law." Restatement (Second) of Conflicts § 7 cmt. b (1971). The facts have been set out in the Background section of this opinion. MeesPierson seeks the application of English law only to the distribution of the estate's general assets. Here, then, is the issue: should a U.S. court, sitting in bankruptcy jurisdiction over chapter 7 liquidation proceedings under the U.S. Bankruptcy Code of a U.S. corporation with a branch office in London, and whose customers lived and traded in both the U.S. and other countries, apply U.S. bankruptcy law with the sole exception of its asset distribution scheme, which would be replaced by an English asset distribution scheme?

This cannot be characterized or classified as anything other than a bankruptcy issue. While the customers certainly entered into contracts with Griffin, those contracts are not here at issue. This court is not determining whether Griffin converted customer funds, which would be a tort issue, or whether Griffin in any way breached any contract with any of its customers; it is merely deciding whether the U.S. Bankruptcy Code's distribution sections should apply in a proceeding under that Code.

MeesPierson argues that this is a contract issue seemingly because all of the customers had contracts with Griffin, most of them negotiated with Griffin's London Office. It concludes that because customers of a U.S. corporation's overseas office agreed to the office's proposed terms of business, the locus of those terms should control the distribution of the corporation's assets in a U.S. bankruptcy proceeding. While alluring, this argument cannot stand up to careful consideration. The administration of· a bankruptcy estate is not .a factual situation within the limits of contract law. Bankruptcy law is bankruptcy law; it is a statutory creation mandated by the U.S. Constitution and enacted by Congress after years of deliberation.

The bare fact that a U.S. corporation liquidating under the provisions of the U.S. Bankruptcy Code entered into contracts with non-U.S. parties to perform actions outside the U.S. is not justification for using the U.K. distribution scheme. Even if it were, no party to the contracts in question has requested it. The Trustee, on behalf of Griffin, one party to the contracts, has requested permission to proceed under the U.S. system. The Customers, the other parties to the contracts, have endorsed the Trustee's request and

have vigorously objected to the application of U.K. law. The only one to request the application of U.K. law is no party to the contracts and lacks standing to seek the contractual relief requested.

Finally, the Second Restatement of Conflicts does not provide a test for most significant contacts to a bankruptcy petition; it provides tests for the most significant contacts to an action in tort, RESTATEMENT (SECOND) CONFLICTS § 145, or contracts, RESTATEMENT (SECOND) CONFLICTS § 188. Even an adaptation of the tort and contract analyses shows that the U.S. has the most significant contacts to Griffin's petition. The court must take into account the place the petition was filed, the place where the liquidation is to be performed, the location of the assets, the place of Griffin's incorporation, and the place of Griffin's business. *See Id.* Although some of Griffin's assets are in the U.K. and Griffin had an office in the U.K., Griffin's headquarters and place of incorporation was the U.S. Most of its assets were in the U.S. The London office was a branch office, an auxiliary place of business and not a separate entity or corporation. The bankruptcy petition was filed under U.S. law and the liquidation is being carried out in a U.S. court with ancillary proceedings in the U.K. Under this set of facts, U.S. law must apply.

### Whether the Doctrine of International Comity Requires the Application of U.K. Law

■ Finally, MeesPierson argues that this court should defer to the U.K. and apply its distribution scheme in the interests of international comity.

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws. *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895).

Arguing that this case is more closely connected to U.K. law than to U.S. law, MeesPierson asks this Court to follow the lead of *Maxwell Communication v. Societe Generale,* 93 F.3d 1036 (2d Cir.1996). In *Maxwell,* the court deferred to the U.K for comity reasons and held that the debtor's estate could not recover transfers made prior to bankruptcy under the avoidance laws of the U.S. However, the facts in *Maxwell* are easily distinguished from those in this case. In *Maxwell,* the debtor was incorporated in England, *Id.* at 1040; Griffin is incorporated in the U.S. The *Maxwell* debtor was headquartered and managed in the U.K., *Id.;* Griffin was headquartered and managed in the U.S. The *Maxwell* debtor filed virtually simultaneous petitions in the United States Bankruptcy Court for the Southern District of New York and the High Court of Justice in London; both courts approved a Protocol to better coordinate the parallel proceedings. There are no parallel proceedings in this case and there is no Protocol. Furthermore, the High Court of Justice has indicated that it does not desire deference to the laws of the U.K. in this proceeding. It has expressly ordered the Provisional Liquidators of Griffin's London assets to "have regard to the ancillary nature of any eventual winding up of the Company in this jurisdiction to the conduct of the Company's bankruptcy in the United States of America under Chapter 7 of the U.S. Bankruptcy Code." *In the Matter of Griffin Trading Co. and In the Matter of the Insolvency Act 1986,* Order of the High Court of Justice, Chancery Division, Companies Court ¶ 4 (Jan. 6, 1999). Under these circumstances, there is no reason to apply the doctrine of comity.

### Validity of the CFTC Bankruptcy Regulation: 17 C.F.R. § 190.08(a)(1)(ii)(J)

The Trustee moves to use estate assets to pay the Customer Claims pursuant to

the provisions of the Challenged Regulation, which gives commodity customers first priority in the distribution of estate assets until their claims have been paid in full or the estate has been exhausted. 17 C.F.R. § 190.08(a)(1)(ii)(J). MeesPierson objects to the Trustee's motion by challenging the validity of the regulation, arguing that the CFTC exceeded the statutory authority to regulate granted in 7 U.S.C. § 24.

■■■ Courts uniformly accord deference to regulations issued under express statutory authority. *Bankers Life and Casualty Co. v. U.S.*, 142 F.3d 973, 979 (7th Cir.1998). However, an administrative agency may not determine the extent of its own authority; such a determination rests solely with the courts. *Batterton v. Francis*, 432 U.S. 416, 424 n. 8, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977) quoting *Social Security Board v. Nierotko*, 327 U.S. 358, 369, 66 S.Ct. 637, 643, 90 L.Ed. 718 (1946).

■■■ The Supreme Court has formulated a two-pronged analysis for review of an administrative agency's construction of the statute which it administers. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2780, 81 L.Ed.2d 694 (1984). In the first prong of *Chevron*, courts must determine whether "Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If Congressional intent is clear from the language of the statute, "that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. This is true no matter how reasonable the agency's construction of the statute may be. *United Transportation Union–Illinois Legislative Board v. Surface Transportation Board*, 183 F.3d 606, 613 (7th Cir.1999). The second prong comes into play only if Congressional intent is not clear from the language of the statute; "if the statute is silent or ambiguous with respect to the specific issue," *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. In that case,

"the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* If Congressional intent is unclear, courts will treat a reasonable agency interpretation of the statute with deference, *Id.; United Transportation*, 183 F.3d at 613, as long as the interpretation is within the agency's statutory grant of authority. *Bankers Life*, 142 F.3d at 979. However, such deference should not "be applied to alter the clearly expressed intent of Congress." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1818, 100 L.Ed.2d 313 (1988).

### Tools of Analysis Under the First Prong of Chevron

■■■ To determine whether Congress has spoken to the precise question at issue, courts must employ "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. First, the court must look at the language of the statutory section at issue. *K Mart*, 486 U.S. at 291, 108 S.Ct. 1811; *Illinois Environmental Protection Agency v. U.S. Environmental Protection Agency*, 947 F.2d 283, 289 (7th Cir.1991). If the plain meaning of the statutory language either "supports or opposes the regulation, then we stop our analysis and either strike or validate the regulation." *Bankers Life*, 142 F.3d at 983.

Next, the court should consider the "language and design of the statute as a whole." *K Mart*, 486 U.S. at 291, 108 S.Ct. 1811; *Illinois EPA*, 947 F.2d at 289. Statutory sections should be construed consistently with each other, and the interpretation of one section should not render another section meaningless or superfluous. *U.S. v. State of Alaska*, 521 U.S. 1, 59, 117 S.Ct. 1888, 1918, 138 L.Ed.2d 231 (1997); *United Transportation*, 183 F.3d at 612. A reading which gives effect to all of a statute's provisions "always prevails over a mere suggestion to disregard or ignore duly enacted law as legislative oversight." *United Food and Commercial*

*Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996).

Courts should also consider legislative history to determine Congressional intent. *United Transportation,* 183 F.3d at 613. There has been some doubt in the Seventh Circuit about whether an examination of legislative history is an appropriate component of the first prong of a *Chevron* analysis, determining legislative intent, or whether legislative history is better left for an analysis under the second prong, determining reasonableness of the challenged regulation. *See Bankers Life,* 142 F.3d at 983 (explaining that while the Seventh Circuit has in the past examined legislative history under the first prong, the Circuit now leans toward reserving legislative history for consideration in the second step). However, in a recent case, the Seventh Circuit again spoke to this issue, stating that legislative history is an appropriate part of an analysis under the first prong of Chevron. *United Transportation,* 183 F.3d at 613. The Seventh Circuit stated that the first question, whether Congress has spoken directly to the point at issue, has been answered "if the statutory language, *with or without the support of legislative history,* is clear, unambiguous, and directly governs the challenged decision." *Id.* (emphasis added).

### Tools of Analysis Under the Second Prong of Chevron

■■■■ If it is necessary to reach the second prong of *Chevron,* the Court must decide whether the regulation harmonizes with the language, origins, and purposes of the statute. *Bankers Life,* 142 F. 3d at 983; *see also, Nat'l Muffler Dealers Ass'n v. U.S.,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979)(explaining, in a pre-*Chevron* opinion, that courts should consider the language, origin, and purpose of a statute to determine whether a regulation carries out the congressional mandate in a proper manner). The appropriate tools in this step include, but are not limit-

ed to, the length of time the regulation has been in effect, the reliance placed on it, the consistency of the agency's interpretation, and whether and to what degree Congress has scrutinized the regulation. *Nat'l Muffler,* 440 U.S. at 477, 99 S.Ct. 1304. Timing is also very important. *Id.; Bankers Life,* 142 F.3d at 983. A regulation promulgated substantially contemporaneously with the statute in question may be given particular force because the interpreting agency was likely aware of congressional intent. *Nat'l Muffler Dealers,* 440 U.S. at 477, 99 S.Ct. 1304. Conversely, "[i]f the regulation dates from a later period, the manner in which it evolved merits inquiry." *Id.*

### The First Prong of Chevron: Has Congress Clearly Spoken to the Treatment of Shortfalls in Customer Property When a Commodities Broker Enters Bankruptcy?

■■■ Under the first prong of *Chevron,* courts must determine whether Congress "has spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. Identification of the precise question is an essential first step. In this case, it must be accomplished by reviewing the appropriate statutory sections, the Challenged Regulation, and the effect that it produces.

The CFTC issued the Challenged Regulation under the statutory authority granted in the Bankruptcy Reform Act of 1978. Pub.L. No. 95–598, tit. III, § 302, 59 Stat. 2673 (1978) (codified at 7 U.S.C. § 24). That section provides:

(a) Notwithstanding Title 11, the Commission may provide, with respect to a commodity broker that is a debtor under chapter 7 of Title 11, by rule or regulation—

(1) that certain cash, securities, other property, or commodity contracts are to be included in or excluded from customer property or member property;

(2) that certain cash, securities, other property, or commodity contracts are to be specifically identifiable to a particular customer in a specific capacity;

. . . .

(b) As used in this section, the terms "commodity broker", "commodity contract", "customer", "customer property", "member property", "net equity", and "security" have the meanings assigned such terms for the purposes of subchapter IV of chapter 7 of Title 11.

7 U.S.C. § 24. The Trustee, the CFTC, and other parties who support the Trustee's motion ("the Trustee *et al.*") rely heavily on the phrase "Notwithstanding Title 11" that begins the section. They argue that it releases the CFTC from the specific limits imposed by the Bankruptcy Code and that any other interpretation would render this provision meaningless. (Second Reply of the CFTC in Support of Trustee's Motion for Authority to Use Estate Assets to Pay Customer Claims in Full, p. 6). In essence, they argue that the "notwithstanding" language, combined with the statutory authority to provide that "certain cash, securities, other property, or commodity contracts are to be included in or excluded from customer property" allows them to rewrite the definition of "customer property" provided in the Bankruptcy Code.

The Bankruptcy Code defines the term "customer property" in detail and at length. Section 761 of the Code provides that:

"customer property" means cash, a security, or other property, or proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the account of a customer—

(A) including—

(i) property received, acquired, or held to margin, guarantee, secure, purchase, or sell a commodity contract;

(ii) profits or contractual or other rights accruing to a customer as a result of a commodity contract;

(iii) an open commodity contract;

(iv) specifically identifiable customer property;

(v) warehouse receipt or other document held by the debtor evidencing ownership of or title to property to be delivered to fulfill a commodity contract from or for the account of a customer;

(vi) cash, a security, or other property received by the debtor as payment for a commodity to be delivered to fulfill a commodity contract from or for the account of a customer;

(vii) a security held as property of the debtor to the extent such security is necessary to meet a net equity claim based on a security of the same class and series of an issuer;

(viii) property that was unlawfully converted from and that is the lawful property of the estate; and

(ix) other property of the debtor that any applicable law, rule, or regulation requires to be set aside or held for the benefit of a customer, unless including such property as customer property would not significantly increase customer property; but

(B) not including property to the extent that a customer does not have a claim against the debtor based on such property;

11 U.S.C. § 761(10). The Trustee *et al.* argue not only that subsection (A)(ix) is a companion to 7 U.S.C. § 24, but that 7 U.S.C. § 24 is itself an applicable law, rule, or regulation requiring that property of the debtor be set aside or held for the benefit of a customer. (Walsh Claimants' Memorandum In Support of the Trustee's Motion for Authority to Use Estate Assets to Pay Customer Claims in Full, pp. 4–5). Thus, they argue, the challenged regulation is consistent with the provisions of the

Bankruptcy Code. (Walsh Claimants' Memorandum at 5).

Section 190.08 of the CFTC regulations largely tracks the language of the Bankruptcy Code or makes the Code's provisions more specific. The Challenged Regulation is the exception. It provides:

(1) Customer property includes the following:

.    .    .    .    .

(ii) All cash, securities, or other property which:

.    .    .    .    .

(J) Is cash, securities or other property of the debtor's estate, including the debtor's trading or operating accounts and commodities of the debtor held in inventory, but only to the extent that the property enumerated in paragraphs (a)(1)(i)(E) and (a)(1)(ii)(A) through (a)(1)(ii)(H) of this section is insufficient to satisfy in full all claims of public customers.

17 C.F.R. § 190.08(a)(1)(ii)(J). This subsection significantly expands the Bankruptcy Code's definition of "customer property" by providing that when, and only when, there is not enough customer property to pay customers in full, all of the debtor's property will be called customer property, whether or not it originated with the customers, and whether or not it comes within the Code's definition, until the customers have been paid in full. MeesPierson argues that this expansion exceeds the authority granted to the CFTC in 7 U.S.C. § 24.

Finally, § 766 of the Code provides that shortfalls in customer property as defined in § 761 shall be treated as general unsecured claims:

(h) Except as provided in subsection (b) of this section, the trustee shall distribute customer property ratably to customers on the basis and to the extent of such customers' allowed net equity claims, and in priority to all other claims, except claims of a kind specified in section 507(a)(1) of this title that are attributable to the administration of customer property. Such distribution shall be in the form of—

(1) cash;

(2) the return or transfer, under subsection (c) or (d) of this section, of specifically identifiable customer securities, property, or commodity contracts; or

(3) payment of margin calls under subsection (a) of this section.

Notwithstanding any other provision of this subsection, a customer net equity claim based on a proprietary account, as defined by Commission rule, regulation, or order, may not be paid either in whole or in part, directly or indirectly, out of customer property unless all other customer net equity claims have been paid in full.

.    .    .    .    .

(j)(1) The trustee shall distribute customer property in excess of that distributed under subsection (h) or (i) of this section in accordance with section 726 of this title.

(2) Except as provided in section 510 of this title, if a customer is not paid the full amount of such customer's allowed net equity claim from customer property, the unpaid portion of such claim is a claim entitled to distribution under section 726 of this title.

11 U.S.C. § 766(h), (j). MeesPierson argues that the provisions of 17 C.F.R. § 190.08(a)(1)(ii)(J) render 11 U.S.C. § 766(j)(2) meaningless.

The Challenged Regulation has this effect: until customers of a bankrupt commodity broker have been paid in full, they receive first priority not only in the distribution of Code Customer Property, but in the distribution of general estate assets as well. Whether Congress so intended is the precise question at issue.

The Trustee *et al.* have framed other questions, arguing that those questions are

the ones at issue. They assert, for instance, that the Court should consider whether Congress intended to protect customers of a bankrupt commodity broker; whether the provisions of 11 U.S.C. § 761(10)(a)(ix) indicate that Congress intended that the CFTC could expand the definition of "customer property" provided therein; and whether the "notwithstanding" language of 7 U.S.C. § 24 demonstrates that Congress intended that the CFTC rulemaking power not be "limned by the specifics of the Bankruptcy Code" (Reply of the CFTC at p. 6). These questions may all shed light on the precise question at issue, but none is itself that question. The Challenged Regulation produces a certain effect when applied, and the precise question at issue is whether Congress intended that effect. Did Congress intend that the CFTC could restructure the distribution scheme provided by the Bankruptcy Code?

Having identified the question at issue, the next step is to look at the language of the statutory sections that may answer it. Because the question involves the order of distribution between customers and general unsecured creditors when there is a shortfall in customer property, the Court will first look at the language of the section governing distribution in such an event, 11 U.S.C. § 766(j)(2).

*Statutory Language*

The plain meaning of § 766(j)(2) is that customers whose claims have not been fully paid from Code Customer Property shall be treated as general unsecured creditors. The section is neither silent nor ambiguous with respect to this issue, but addresses it directly and straightforwardly. While § 766(j)(2) makes reference to other sections of the Code, it is nevertheless simply drafted. It means exactly what it seems to mean: that when customers have not been paid in full from customer property, they will be treated as general unsecured creditors of the estate as to the shortfall. Congressional intent is clear

from the text. The CFTC Regulation produces an opposite effect, ensuring that customers, as defined by the Code, 11 U.S.C. § 761(9), will never share *pro rata* with other unsecured creditors in the distribution of the general estate, but will take all that there is to take until they have been fully paid.

This might be the end of the matter because Congressional intent is clear from the text of § 766(j)(2). However, this problem involves not just § 766(j)(2), but 11 U.S.C. § 761(10)(A)(ix) and 7 U.S.C. § 24, as well. The Trustee *et al.* assert that 7 U.S.C. § 24 expressly authorizes the CFTC to change the definition of "customer property" provided in 11 U.S.C. § 761(10). The CFTC argues that "Congress specifically contemplated that the [CFTC] could include or exclude specific property from the definition of 'customer property' in the Bankruptcy Code." (Second Reply of the CFTC at p. 12).

The Court agrees with the CFTC to a certain extent, but not to the extent necessary to validate the regulation. The CFTC can include or exclude *specific*, as it says, or *certain*, as 7 U.S.C. § 24(a) says, property in or from "customer property." The CFTC has done so in other subsections of 17 C.F.R. § 190.08. For instance, § 190.08(a)(1)(i)(E) includes proceeds of letters of credit if the letter of credit was received, acquired, or held to margin, guarantee, secure, purchase, or sell a commodity contract; § 190.08(a)(1)(i)(F) includes customer property hypothecated or pledged to the FCM as security for a loan; § 190.08(a)(1)(ii)(D) includes property that was received, acquired or held to margin, guarantee, secure, purchase or sell a commodity contract, but which has been withdrawn and subsequently is recovered by the avoidance powers of the trustee; and § 190.08(a)(1)(ii)(E) includes recovery of debit balances or other deficits against a customer account. These subsections all refer to property originating in or traceable in some way to a customer's account. However, the authority to include or ex-

clude "certain" or "specific" property is not authority to include any or all property in general. It would have been simple for Congress to grant such authority; substitution of the word "any" or "all" for the word "certain" would have done it. Use of the word "certain" is not a Congressional mistake made in ignorance, or for lack of a better word, but is intended to limit the CFTC's authority to specific items. This intent is made even more apparent by the plain language of 7 U.S.C. § 24(b), which provides that the term "customer property" has the meaning assigned to it in the commodity broker subchapter of the Code.

## Language and Design of the Statute as a Whole

An interpretation of 7 U.S.C. § 24 that limits the CFTC's authority to inclusion or exclusion of specific items is also consistent with the language and design of the Bankruptcy Reform Act, of which it is a part, as a whole. It gives force and effect to the obvious meaning of 11 U.S.C. § 766(j)(2) and harmonizes with the detailed definition of "customer property" provided in the Bankruptcy Code. A review of the three statutory sections at issue makes evident that Congress intended that customers should receive first priority in the distribution of "customer property," but should share *pro rata* with other unsecured creditors in the event of a shortfall in "customer property." The CFTC has made a formalistic end-run around this intent by labeling all estate property as "customer property" and bringing it under the provisions of 11 U.S.C. § 766(h), which grants customers first priority to "customer property." In other words, the CFTC has not only altered the Code's definition of "customer property," but has changed the distribution priority scheme set forth in the commodity broker subchapter of the Code.

According to the Trustee *et al.*, the Code's definition of "customer property," 11 U.S.C. § 761(10), specifically allows the CFTC to do this. They point to § 761(10)(A)(ix), which includes "other property of the debtor that any applicable law, rule, or regulation requires to be set aside or held for the benefit of the customer...." 11 U.S.C. § 761(10)(A)(ix). However, this subsection does not stand alone; it completes the sentence at the beginning of the section. The sentence reads in full that:

> customer property means cash, a security, or other property, or proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the account of a customer ... including ... other property of the debtor that any applicable law, rule, or regulation requires to be set aside or held for the benefit of a customer....

11 U.S.C. § 761(10)(A)(ix). Plainly, this section requires that "customer property" must come from ("from the account of a customer") or be intended for the account of a customer ("for the account of a customer"). The section also requires that the property be "set aside" or "held" for the benefit of a customer and not merely in the FCM's possession. Finally, § 761(10)(B) does not include property "to the extent that a customer does not have a claim against the debtor based on such property." 11 U.S.C. § 761(B).

> Congress explained that this section:
> defines "customer property" to include all property in customer accounts and property that should have been in those accounts but was diverted through conversion or mistake. Clause (i) (the present § 761(10)(a)(vii)) refers to customer property not properly segregated by the debtor or customer property converted and then recovered so as to become property of the estate. Clause (vii) (the present § 761(10)(a)(ix)) is intended to exclude property that would cost more to recover from a third party than the value of the property itself. Subparagraph (B) excludes property in a customer's account that belongs to the commodity broker, such as a contract placed

in the account by error, or cash due the broker for a margin payment that the broker has made.

H.R.REP. No. 95–595, at 386–87 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6342–43 (cross-references to present section numbers added).

The CFTC argues that § 766(j)(2) provides only residual protection for customers and is not evidence of Congressional intent that customer priority is limited to customer property. However, the plain language of 7 U.S.C. § 24, 11 U.S.C. § 766(j)(2), and 11 U.S.C. § 761(10)(A)(ix) and the overall design of the statute refute this argument. They clearly indicate that Congress did not intend that customers receive first priority in the distribution of general estate assets. Section 766(j)(2) expressly provides that, after customer property has been exhausted, customers would share in the general estate on the same footing with other general, unsecured creditors. 11 U.S.C. § 766(j)(2).

### Legislative History

The legislative history of the Code supports the conclusion that Congress intended that customer shortfalls be paid *pro rata* with general unsecured claims. The House bill introduced on September, 8, 1977, and which Congress later amended and adopted as The Bankruptcy Reform Act of 1978, contained the provisions of the present § 766(j)(2) almost word for word. Section 767(c)(2) of the House bill provided:

> Except as provided in section 510 of this title, if a customer is not paid the full amount of such customer's allowed net equity claim from customer property, the unpaid portion of such claim is a claim entitled to distribution under section 726(a)(2) of this title.

H.R. 8200, 95th Cong. § 767(c)(2) (1977). The only difference between the language of H.R. 8200 and § 766(j)(2) is that H.R. 8200 limits the application of § 726 to a particular subsection. Section 726(a)(2) of H.R. 8200, like § 726(a)(2) of the Bank-

ruptcy Code, governs the distribution of estate property to unsecured creditors. Although the section speaks for itself, the accompanying Report, H.R. REP. No. 95–595, at 393, made clear that the language means exactly what it says. "Subsection (c)(2) indicates that to the extent customers are not paid in full, they are entitled to share in the general estate as unsecured creditors, unless subordinated by the court under proposed 11 U.S.C. § 510." *Id.* The Senate bill, introduced on October 31, 1977, contained an identical provision. S. 2266, 95th Cong. § 767(c)(2) (1977).

During the amendment process, the Senate eliminated § 767(c)(2) from H.R. 8200, but the section was restored by House amendment. 124 CONG. REC. S17416 (daily ed. Oct. 6, 1978) (statement of Sen DeConcini) and approved by the Senate. Senator DeConcini explained the amended section, renumbered, as at present, as § 766(j), stating that "the section also specifies that to the extent a customer is not paid in full out of customer property, that the unpaid claim will be treated the same as any other general unsecured creditor." *Id.* Even if the language of the statutory section was ambiguous, which it is not, this very plain, concise statement cannot mean anything other than what it says: that Congress intended claims not fully paid out of "customer property" to be "treated the same as any other general unsecured creditor."

The CFTC, through its first chairman, William T. Bagley ("Bagley"), actively participated in creating the commodity broker subchapter of the Bankruptcy Code, *see* H.R.REP. No. 95–595, at 271 (explaining that the content of the commodity broker subchapter was derived largely from Bagley's testimony). However, although the CFTC commented extensively on other subsections of § 767 of both the House and Senate bills, specifically and extensively objecting to the payment of administrative expenses from "customer property," *Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcom-*

mittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 95th Cong. 1223–24 (1977) (testimony of William T. Bagley, Chairman of the CFTC), it never voiced any objections to the provision here at issue.

The CFTC never recommended to Congress that customers of a bankrupt commodities broker receive first priority to all estate assets. Rather, one of the CFTC's major concerns was that the customers receive priority to those assets identifiable or traceable to them. *The Bankruptcy Reform Act of 1978: Hearings on H.R. 31 and H.R. 32 Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary,* 94th Cong. Part IV at 2387 (1976) [hereinafter the *"House Hearings"*]; *The Bankruptcy Reform Act of 1978: Hearings on S. 235 and S. 236 Before the Subcommittee on Improvements in the Judicial Machinery of the Senate Committee on the Judiciary* [hereinafter the *"Senate Hearings"*], 94th Cong. Part III at 62 (1975). To protect commodity customers, the CFTC recommended that:

1.  commodity customers of a bankrupt futures commission merchant be given a statutory preference to all funds segregated as belonging to such customers or otherwise traceable to them;

2.  the CFTC be given the power to determine, by rule or regulation, which assets are traceable to such commodity customers in general; and

3.  commodity customers be entitled to share ratably in funds traceable to such customers as a class.

*House Hearings,* Part IV at 2388; *Senate Hearings,* Part III at 73. Bagley, on behalf of the CFTC, explained that "[t]hese provisions would ensure that commodity customers receive adequate protection in the bankruptcy of a futures commission merchant without unfairly prejudicing the claims of general creditors of the bankrupt futures commission merchant." *Id.*

The Trustee *et al.* point out that a primary purpose of the commodity broker subchapter of the Bankruptcy Code is protection of the bankrupt broker's customers. This is undoubtedly true. The desire to protect customers motivated the CFTC first to recommend the addition of special procedures for commodity broker bankruptcy to the proposed legislation. *House Hearings,* Part IV at 2377; *Senate Hearings,* Part III at 51. Congress acted on the CFTC's recommendations and the next version of the proposed legislation was introduced in the House on January 4, 1977. H.R. 6, 95th Cong. (1977). Although no prior bills in the legislative process, which began in 1968, contained any special provisions for commodity brokers, H.R. 6 contained a full subchapter on commodity broker bankruptcy. H.R. 6, 95th Cong. §§ 761–769 (1977). H.R. 6 was amended and introduced on May 23, 1977 as H.R. 7330, 95th Cong. (1977). H.R. 7330 as amended became H.R. 8200, which in turn was amended and enacted as the Bankruptcy Code. The House Report accompanying H.R. 8200 stated that "H.R. 8200 provides a special procedure for the bankruptcy of commodity brokers. The provision fill [sic] a void in current law and recognize [sic] that customers of commodity brokers are entitled to special protection. The content of the provision is derived largely from testimony of Chairman Bagley." H.R.Rep. No. 95–595, at 270 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6229. The Senate stated that one of the fundamental principles established by the commodity broker subchapter is that "customer claims are granted the highest priority against the bankrupt's estate. This policy maintains consistency with the Commodity Exchange Act, which establishes customer protection as a primary objective and should promote customer confidence in commodity markets generally." S.Rep. No. 95–989, at 7 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5793.

However, while Congress' general intent regarding the entire subchapter is impor-

tant, the *Chevron* test very clearly requires examination of whether "Congress has directly spoken to the *precise question at issue.*" *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778 (emphasis added). Thus, the question to be answered is not, as the Trustee *et al.* would have it, whether Congress intended to protect customers of a bankrupt commodity broker by creating a commodity broker subchapter. Clearly, Congress did. However, this intention is an overarching, general intention and cannot satisfy the first prong of *Chevron.*

*Chevron* demands a specific answer to a precise question. *See, e.g., Illinois EPA,* 947 F.2d at 289 (considering whether a statute addressed the specific issue created by the challenged regulation). The question here to be answered is not whether Congress intended to protect, but rather, what protections Congress intended to give. Did Congress intend that a bankrupt broker's customers receive first priority in the distribution of property other than that defined in the Code as "customer property"? The plain meaning of the statutory language and the language and design of the statute as a whole, supported by the legislative history demonstrate that Congress has spoken to the precise question at issue. Congress did not intend that the CFTC have the power to restructure the distribution scheme of the Bankruptcy Code.

### Canons of Statutory Construction

While Congressional intent is clear from plain meaning and legislative history, MeesPierson has also argued that, contrary to established rules of statutory construction, the Challenged Regulation renders § 766(j)(2) meaningless. The Court addresses this issue in the interests of completeness.

Even if Congressional intent was not clear from the plain meaning of the statutory sections and from the language and design of the statute as a whole, the rule of statutory construction that avoids an interpretation of one section that renders another section meaningless also leads to the conclusion that the Challenged Regulation is invalid and must be stricken.

Section 766(j)(2) expressly contemplates the possibility that there will be a shortfall in Code Customer Property and issues instructions to be followed in such an event. The Challenged Regulation ensures that one of two eventualities will always come to pass. Under either scenario, § 766(j)(2) is made superfluous.

In the first scenario, there would be enough property in the bankruptcy estate to replace the shortfall in Code Customer Property completely. Thus, there would be no customers who were not paid the full amounts of their claims, and the event which would trigger § 766(j)(2), a shortfall remaining after all "customer property" had been paid to customers, would never occur. Consider the hypothetical example that follows. Imagine a $1 million shortfall in Code Customer Property. Further imagine that the hypothetical estate has assets of $1.5 million. The shortfall in Code Customer Property triggers the Challenged Regulation; the Challenged Regulation imposes the label of "customer property" on all general estate property; and the Trustee accordingly, and in priority to almost all other claims, pays the $1 million shortfall from the $1.5 million estate, leaving a balance of $500,000 to be paid to general creditors. Thus, there is property in the estate to pay out under 11 U.S.C. § 726, but there are no longer any customers who have not been paid the full amount of their claims from "customer property." The Challenged Regulation effectively circumvents § 766(j)(2) in this scenario.

In the second, reverse, scenario, there would not be enough property in the bankruptcy estate to replace the shortfall in customer property. Thus, in this situation, there would be customers whose claims were not fully paid, but there would be no general estate property from which to pay them, or any other unsecured credi-

tors, under § 726. All estate property would already have been labeled as "customer property" under the Challenged Regulation, and exhausted in partially paying the customers. For example, in this case, the shortfall in Code Customer Property amounts to approximately $4.3 million. (Trustee's Motion for Authority to Use Estate Assets to Pay Customer Claims in Full ¶ 14). The Trustee estimates that the estate assets amount to approximately $3.7 million. (Trustee's Motion ¶ 12). The shortfall would trigger the provisions of the Challenged Regulation and the $3.7 million would be labeled "customer property" and paid out entirely to partially satisfy the Customer Claims. After all property had been distributed as "customer property," there would still be a $600,000 ($4.3 million—$3.7 million) shortfall, which would trigger § 766(j)(2). However, invoking § 766(j)(2) with the Challenged Regulation in place would be an exercise in futility, because there would be nothing left in the estate to be paid out under § 11 U.S.C. §§ 726.

The CFTC points out that the Challenged Regulation applies only to "public customers" and not to "non-public" or "proprietary" customers. Therefore, it argues, the Challenged Regulation does not render § 766(j)(2) meaningless. (Second Reply of the CFTC at pp. 4–5).

The CFTC defends its expansion of the Code's definition of "customer property" with its contraction of the Code's definition of "customer." The Bankruptcy Code defines a "customer" with respect to an FCM[7] as an:

> (i) entity for or with whom such futures commission merchant deals and that holds a claim against such futures commission merchant on account of a commodity contract made, received, acquired, or held by or through such fu-

tures commission merchant in the ordinary course of such futures commission merchant's business as a futures commission merchant from or for the commodity futures account of such entity; or

> (ii) entity that holds a claim against such futures commission merchant arising out of—
>
>> (I) the making, liquidation, or change in the value of a commodity contract of a kind specified in clause (i) of this subparagraph;
>>
>> (II) a deposit or payment of cash, a security, or other property with such futures commission merchant for the purpose of making or margining such a commodity contract; or
>>
>> (III) the making or taking of delivery on such a commodity contract.

11 U.S.C. § 761(9)(A).

However, "public customers" and "proprietary" or "non-public customers" are classes created by the CFTC. 17 C.F.R. § 190.01(m). To discover what public and non-public customers are, one must look at several sections of the CFTC regulations, 17 C.F.R. § 1.1 *et seq.*, and a section of the Bankruptcy Code. First, in § 190.01(hh), the CFTC states that a "public customer" is "any person defined as a customer under paragraph (k) of this section except a non-public customer." 17 C.F.R. § 190.01(hh). Paragraph (k) of the section tells us that the term "customer" has the same meaning in the CFTC bankruptcy regulations as it has in the Bankruptcy Code. A "non-public customer" or "proprietary customer" is, in simplified terms, an insider of the broker. 17 C.F.R. §§ 1.3(y), 31.4, 190.01(bb). Thus, the CFTC has limited the Code's definition of a "customer" to those who are "public customers" and, without any statutory au-

---

7. The Bankruptcy Code defines the term "customer" in several different ways. 11 U.S.C. § 761(9). The applicable definition depends on whether the broker is an FCM, 11 U.S.C. § 761(9)(A), a foreign FCM, 11 U.S.C. § 761(9)(B), a leverage transaction merchant, 11 U.S.C. § 761(9)(C), a clearing organization, 11 U.S.C. § 761(9)(D), or a commodity options dealer, 11 U.S.C. § 761(9)(E). Because Griffin was an FCM, the only applicable definition is that of a customer under 11 U.S.C. § 761(9)(A).

thority[8], excluded others from the definition.

Thus, the CFTC attempts to justify the Challenged Regulation with the provisions of another regulation that also seems to be contrary to Congressional intent. Even if the CFTC is correct in asserting that its "public customer" and "non-public customer" definitions save 11 U.S.C. § 766(j)(2) from meaninglessness, it does not alter Congress' clearly-expressed intent that customer shortfalls be paid *pro rata* with other unsecured claims.

The plain language of 11 U.S.C. § 766(j)(2), the plain language of 7 U.S.C. § 24, the language and design of the Bankruptcy Reform Act as a whole, and the legislative history all clearly show that Congress intended that customers who were not paid in full from customer property should be treated as general unsecured creditors. The CFTC Regulation does not give effect to this clearly expressed intention, but opposes it. The Regulation must be stricken under the first prong of *Chevron*.

*The Second Prong of Chevron: Is the Challenged Regulation Based on a Reasonable Construction of the Bankruptcy Reform Act of 1978?*

In the alternative, the Court holds that the Challenged Regulation is not based on a reasonable interpretation of the three statutory sections, 7 U.S.C. § 24, 11 U.S.C. § 761(10)(a)(ix), and 11 U.S.C. § 766(h). The Challenged Regulation does not harmonize with the language, origins, or purpose of the statutes.

*Consistency of the CFTC's Interpretation*

As discussed in the preceding section on Congressional intent, the Challenged Regulation distorts the language of 11 U.S.C. § 761(10)(a)(ix), defining "customer property," by expanding its detailed, but limited, provisions to include all property of the

debtor's estate. It also distorts the definition of "customer" provided in 11 U.S.C. § 761(9), by practically limiting that group to those whom the CFTC regards as "public customers." Furthermore, the Challenged Regulation effectively disposes of the language in 11 U.S.C. § 766(j)(2), which places unpaid customers on the same footing as other unsecured creditors.

The commodity broker subchapter of the Bankruptcy Code originated with the CFTC's request to Congress for special provisions that would protect customers in the event of a bankruptcy. However, the protection requested was far less sweeping than that which the CFTC has now provided. As discussed above, the CFTC recommended to Congress that customers receive preference in the distribution of assets which are either segregated or traceable to them. *House Hearings*, Part IV at 2387; *Senate Hearings*, Part III at 62. Congress granted that request and, in 7 U.S.C. § 24, gave the CFTC the power to specify which assets are traceable and how they would be traced. The CFTC overstepped its granted powers when it promulgated the Challenged Regulation; the Challenged Regulation is inconsistent with the provisions of the Bankruptcy Code.

*Timing of the Challenged Regulation's Enactment*

The CFTC enacted the Challenged Regulation as of March 31, 1983, almost five years after the President signed the new bankruptcy law on November 6, 1978 and almost four years after the Code became effective on October 1, 1979. Because the Challenged Regulation dates from a later period than the Bankruptcy Reform Act of 1978, the manner of its evolution merits inquiry.

The objections MeesPierson raises to the Challenged Regulation are not new.

---

8. 7 U.S.C. § 24 does not give the CFTC any power to include persons in, exclude persons from, or otherwise alter the definition of the term "customer" provided in the Bankruptcy Code.

Commentators raised the same issues during the public comment period for the proposed CFTC bankruptcy rules. During the comment period, which lasted from November 24, 1981 through May 15, 1982, 48 F.R. 8716, the CFTC received eight written comments. *Id.* Two of those comments were the objections to the Challenged Regulation that are now before the Court. *Id.* The CFTC responded to the objections in the following manner:

> The Commission believes that the Bankruptcy Act makes clear that the customer priority for commodities customers is to be broader than a priority in the property actually segregated by the debtor in their behalf. This intent is evident from the legislative history which, among other things, expressly states that the definition of customer property is to "include all property in customer accounts and property that should have been in those accounts but was diverted through conversion or mistake." Moreover, ordinarily priorities are charges on the assets of the full estate. The Commission concludes that by granting authority to the Commission to expand or contract "customer property," Congress sought to minimize the need for the trustee to trace property belonging to customers. Thus, the Commission believes its definition of customer property may establish presumptions with respect to certain property of the debtor which was not segregated so as to enable its return to customers.

*Id.*

This justification is flawed from the outset. Congress did not grant authority to the CFTC to "expand" or "contract" the definition of "customer property." Congress granted authority to the CFTC to "include" or "exclude" "certain," or as the CFTC has said in its briefs, "specific," property in customer property. 7 U.S.C. § 24. While the other subsections of 17 C.F.R. § 190.08 do just this, the Chal-

lenged Regulation swallows the entire estate in one gulp.

The CFTC further explained away the objections by pointing out that Congress did not intend to limit customer property to that actually sitting in segregated accounts. 48 F.R. 8716, 8717. The Code's definition of customer property makes this abundantly clear, and the other sections of § 190.08 carry out this intention. However, the Challenged Regulation does much more than follow funds outside of segregation; it removes any need to follow funds by simply taking everything.

### Court or Congressional Scrutiny

Finally, although the Challenged Regulation has remained in effect for the past seventeen years, the Court's research has not produced any cases in which the Regulation has been either applied or challenged. Nor can the Court find that Congress has ever scrutinized the Challenged Regulation. *See* Andrea M. Corcoran, *Markets' Self-Assessment and Improvement of Default Strategies After The Collapse of Barings*, 2 STAN. J.L. BUS. & FIN. 265, 281–82 (1996) (noting that the CFTC's interpretation of the Bankruptcy Code has never been tested).

In light of the Challenged Regulation's failure to harmonize with language, purposes, and origins of the statute, and after consideration of other factors such as the evolution of the Challenged Regulation after a lapse of several years and the lack of scrutiny or application in either the courts or Congress, the Court holds that the Challenged Regulation is not based on a reasonable interpretation of the statute. It must be stricken under the second prong of *Chevron.*

### CONCLUSION

For the reasons set forth in the foregoing opinion, the bankruptcy laws of the United States will apply to the distribution of Griffin's bankruptcy estate. The Challenged Regualtion, 17 C.F.R. § 190.08(a)(1)(ii)(J) exceeds the CFTC's

statutory authority to regulate and must be stricken. The Trustee's Motion for Authority to Use Estate Assets to Pay Customer Claims in Full is denied.